In re MID–AMERICAN CLEAN WATER SYSTEMS, INC., Debtor,

MID–AMERICAN CLEAN WATER SYSTEMS, INC., and Bruce Ewing, Plaintiffs,

v.

FIRST SAVINGS BANK, Defendant.

Bankruptcy No. 90–40641–7.
Adv. No. 92–7115.

United States Bankruptcy Court, D. Kansas.

Oct. 22, 1993.

Timothy H. Girard, John C. Pauls, Woner, Glenn, Reeder, Lowry & Girard, Topeka, KS, for plaintiffs.

Joseph A. Knopp, Stites, Hill, Wilson Knopp & Abbott, Manhattan, KS, for defendant.

John Foulston, U.S. Trustee, Wichita, KS.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Chief Judge.

This proceeding is before the Court to determine whether the defendant, First Savings Bank, must repay the plaintiffs, Mid–American Clean Water Systems, Inc., and Bruce Ewing, funds alleged to have been wrongfully paid out of Mid–American's account and pay additional damages as well. The plaintiffs are represented by Timothy H. Girard and John C. Pauls of Woner, Glenn, Reeder, Lowry and Girard, Topeka, Kansas. The defendant is represented by Joseph A. Knopp of Stites, Hill, Wilson, Knopp and Abbott, Manhattan, Kansas.

The matter was tried to the Court, and the parties have submitted memoranda in support of their respective positions. The Court is now prepared to rule.

## FACTS

Bruce Ewing and two others owned Mid–American and another similar business. Mid–American had forty employees in Manhattan, and the other company had about that many in Wichita. Ewing was the president and in charge of the installation of Mid–American's products, another owner was the vice-president and in charge of sales, and the third was the secretary and in charge of finances. All three signed the deposit cards for Mid–American's accounts at First Savings Bank (FSB). The three owners guaranteed the loan from FSB which funded the start of Mid–American's business. As early as April 19, 1988, Ewing and the corporation had used a stamp bearing Ewing's signature to sign checks drawn on Mid–American's accounts. Although only Ewing was authorized to use the signature stamp, all three owners and the company's bookkeeper had access to the filing cabinet where the stamp was kept along with Mid–American's check book and deposit slips.

A man named Steve Rosenbaum worked for Mid–American for two months in mid-1988 before he was made the bookkeeper and given access to the filing cabinet. He was responsible for doing the company's books, giving necessary records to the company's CPA firm, and getting the mail. He would also prepare checks to pay the bills, and Ewing or one of the other owners would then sign them. Ewing trusted Rosenbaum and the corporate secretary to

take care of the business's finances. So far as the evidence showed, no one actually supervised Rosenbaum's activities.

Within a fairly short time, Rosenbaum began embezzling money from Mid–American by forging checks and perhaps by intercepting payments on accounts receivable mailed to the business. Sometimes he hand-forged Ewing's signature on the checks and sometimes he used the signature stamp although he was not authorized to use it. At issue in this trial were checks drawn on two Mid–American accounts at FSB. Photocopies of both the checks and forgery affidavits which Ewing signed for most of them were presented at the trial. After viewing these photocopies, the Court finds that the hand-forgeries are not readily distinguishable from the stamped ones; indeed, Ewing himself indicated at trial that for two of the checks, he could only say it was probable that the signatures were made with the stamp. In fact, the Court believes Ewing's signatures on the forgery affidavits vary nearly as much from the signature stamp as the worst of the hand-forged signatures.

The following chart identifies each forged check by number, the date FSB paid it, whether it was paid to Rosenbaum or to someone else, the amount of it was for, whether Ewing testified it was forged by hand or stamp, and the Court's own conclusion how the check was forged.

| Check | Date paid | Payee or bill paid | Amount | Ewing's testimony | Court's finding |
|-------|-----------|--------------------|--------|-------------------|-----------------|
| 2818 | 8–30 | Rosenbaum | 152.10 | stamp | stamp |
| 3376 | 9–4 | Rosenbaum | 856.12 | hand-forged | hand-forged |
| 2864 | 9–7 | Rosenbaum | 222.47 | stamp? | hand-forged |
| 3423 | 9–9 | Car | 9967.50 | none | stamp |
| 3552 | 9–19 | Phone bill | 500.00 | stamp | stamp |
| 3513 | 10–4 | Truck | 3000.00 | stamp? | stamp |
| 3540 | 10–7 | Repair | 231.92 | hand-forged | hand-forged |
| 3582 | 10–14 | Deposit | 1206.79 | hand-forged | hand-forged |

The question marks in the column for Ewing's testimony identify the checks he could only say were probably stamped. The four checks the Court found to be forged with the stamp contain signatures which appear to the Court to be identical to one another. With respect to check number 2864 which Ewing thought was forged with the stamp, the Court finds the signature, particularly the 'B' of Ewing's first name, is not the same as the four stamped signatures, but is virtually indistinguishable from the signatures which Ewing placed on the forgery affidavits.

After paying the first of these forged checks, FSB included it in the August 31, 1988, statement it mailed to Mid–American on September 1. After paying the next four, FSB included them in the September 30 statement it mailed to Mid–American on October 3. It included the last three in the October 31 statement it mailed to Mid–American in early November. Mid–American did not discover Rosenbaum's activities until November 5, 1988, when the manager of a Radio Shack store called Ewing about a purchase Rosenbaum was trying to make with a Mid–American check. Ewing told him the purchase was not authorized, and then called the police to begin a criminal investigation.

On November 5, Ewing notified FSB of the forgeries. Sometime before November 8, he fired Rosenbaum. He also discovered some of Mid–American's bank statements were missing and obtained copies from FSB. He testified the missing statements were for September and October, but the Court believes he was referring to the August 31 statement which should have been received in early September and the September 30 statement which should have been received in early October. The Court finds it is more likely than not that FSB did

mail the August 31 and September 30 statements, and that, in order to hide his embezzlements, Rosenbaum intercepted and destroyed them when he picked up Mid–American's mail.

At various times in November, Ewing signed affidavits declaring that a number of checks had been forged, including those now at issue. Ewing apparently reported about twenty checks had been forged. Initially, FSB recredited Mid–American's account for those checks which could possibly be charged back against other banks; this included all but the three payable to Rosenbaum, which he had cashed at FSB. Another, number 3582, was not recredited because it had been deposited into a Mid–American account at a savings and loan. FSB later redebited three of those previously recredited to the account because it was unable to shift liability on them to other banks.

Because the forged checks were being paid from the account but were not included on Mid–American's records, legitimate checks began to bounce and FSB imposed a number of returned check charges against Mid–American. Some of these, over one-half, were apparently reversed sometime later, and at trial, Mid–American dropped its claim to try to recover any more of them. In some way not disclosed at the trial, the two vehicles Rosenbaum had bought with forged checks were recovered. Mid–American, through Ewing, negotiated with FSB and reached an agreement to have the vehicles sold, with any deficiency to be paid by Mid–American, and to pay the bank for any of Rosenbaum's forged checks on which FSB was unable to shift liability. As a result of the agreement, FSB agreed to make further loans to Mid–American and not to pursue "other actions."

In connection with this agreement, Mid–American borrowed about $19,000 in late November and about $25,000 in mid-December, using the proceeds in part to cover the amounts owed on the vehicles and forged checks. Ewing personally guaranteed these loans. The car purchased with check number 3423 was resold for much

less than Rosenbaum had agreed to pay, and consequently, Mid–American wrote a new check for the same amount as that check to pay the deficiency. In March of 1989, Ewing borrowed more money, giving FSB a mortgage on his home, and used the proceeds to reduce Mid–American's debt to FSB. FSB never told Ewing that Mid–American might be able to hold FSB liable for paying the forged checks or that he should seek independent legal advice on that question. Ewing did not seek legal advice about the forgeries until sometime in mid–1991, when a relative who was a former banker told him FSB had done something wrong. In April of 1990, Mid–American filed for bankruptcy, including losses arising from the Rosenbaum embezzlement in its schedule of debts.

The debtor and Ewing filed this lawsuit against FSB on August 5, 1992, claiming improper payment of the forged checks and breach of the bank's duty of good faith and fair dealing. Ewing joined as a plaintiff on the theory his guarantee of the loans made to Mid–American in November and December of 1988 and the personal loan he obtained and mortgage he gave in March of 1989 also arose from FSB's breach of its implied duty of good faith and fair dealing. The breach allegedly occurred when FSB's officer, knowing that the bank was actually liable for wrongfully paying the checks, told Ewing that Mid–American was responsible for the paying them, and then FSB made future loans contingent on the plaintiffs' payment of the checks.

## DISCUSSION AND CONCLUSIONS

As a preliminary matter, FSB argues the plaintiffs' claims are barred by the three-year statute of limitations found in K.S.A. 60–512. The plaintiffs respond that the five-year limit in K.S.A. 60–511 controls their claims on the forged checks and for breach of contract; but if K.S.A. 60–512 controls their breach of contract claims, then the breach was not reasonably ascertainable until Ewing's relative told him FSB had acted improperly. Both limitation periods begin running when a cause of action accrues. *K.S.A. 60–510.* Mid–

American's claims for improper payment of the forged checks would have accrued no earlier than August of 1988 when the first check was forged and no later than November of 1988 when Ewing discovered the forgeries. Both plaintiffs' claims for breach of the implied duty of good faith and fair dealing would have accrued no earlier than November of 1988, when Ewing first discovered and spoke to FSB about the forgeries; the only later dates that seem possibly relevant to these claims are March of 1989 when Ewing obtained the last FSB loan mentioned by the parties and mid–1991 when Ewing's relative informed him FSB had done something wrong in connection with the forged checks. If the plaintiffs are correct that the five-year statute applies, their claims are all timely without regard to the exact time the claims accrued.

In pertinent part, K.S.A. 60–511 provides: "The following actions shall be brought within five (5) years: (1) An action upon any agreement, contract or promise in writing." K.S.A. 60–512 provides: "The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing. (2) An action upon a liability created by a statute other than a penalty or forfeiture." The plaintiffs contend the signature card for Mid–American's account at FSB constitutes the written contract which FSB breached by paying the forged checks and requiring Mid–American to pay for them. Unfortunately, neither party submitted the signature card or any other writing to the Court for consideration. Nevertheless, the Court has reviewed some Kansas cases in an effort to determine which statute might be applicable.

The plaintiffs rely on *Cairo Cooperative Exchange v. First Nat'l Bank,* 228 Kan. 613, 620 P.2d 805 *(1980), modified on rehearing* 229 Kan. 184, 624 P.2d 420 *(1981),* a case involving a bank's failure to comply with the terms of restrictive endorsements on checks. The Kansas Supreme Court held that a depositor's signature card was an express contract with the bank and that, absent an expressed intent of the parties to the contrary, Articles 3 and 4 of the Uniform Commercial Code are made express provisions of the depositor's contract. 228 Kan. at 619, 620 P.2d 805. On rehearing, the court indicated, without citation or discussion, that an action for the breach of a UCC provision not actually recited in the signature card was nevertheless covered by the five-year statute, K.S.A. 60–511. 229 Kan. at 184, 624 P.2d 420. In another case a few years later, the court considered which statute applied when a bank stamped "P.E.G." ("prior endorsements guaranteed") on a check with no endorsements and sent it through banking channels for payment. *Chilson v. Capital Bank,* 237 Kan. 442, 701 P.2d 903 *(1985).* The court of appeals had indicated that the "P.E.G." stamp could not constitute the writing required to make the five-year statute applicable because it did not say that missing as well as prior endorsements were guaranteed, and the cause of action was based on the absence of a necessary endorsement. 10 Kan.App.2d 111, 112–114, 692 P.2d 406. Although the basis of its decision is somewhat less clear, the supreme court did affirm the conclusion of the court of appeals. 237 Kan. at 446–48, 701 P.2d 903. The supreme court distinguished *Cairo Cooperative Exchange* on the ground it involved a cause of action based on a written contract (the signature card) into which the law implies additional terms while the "P.E.G." stamp did not create a contract but only echoed an obligation already imposed on the bank by the UCC without regard to the stamp. 237 Kan. at 446–47, 701 P.2d 903.

■ Based on these authorities, the Court concludes the five-year statute applies to the plaintiffs' claims. Even if FSB's obligation not to pay checks with forged signatures was not expressed in the signature card, it is stated in the UCC and, under *Cairo Cooperative Exchange,* became an express provision of the contract. Similarly, assuming Kansas law does impose a duty of good faith and fair dealing on every contractual relationship, this duty also became an express provision of the agreement.

Having concluded the five-year statute applies, the Court need not resolve the plaintiffs' claim that the statute of limitations would have been tolled from the time FSB required them to pay for the checks until Ewing's relative informed him the bank might have been liable for them. The Court does note that it seriously questions whether limitations should be tolled in favor of parties who know all the facts necessary to their claims but fail to act on them based on a potential adversary's representations about the applicable law.

The Court now turns to the plaintiffs' claims to recover the money they paid on the forged checks. K.S.A. 84-3-404(1) states in pertinent part: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ... is precluded from denying it." [1] K.S.A.1992 Supp. 84-1-201(43) defines "unauthorized signature" to mean "one made without actual, implied or apparent authority and includes a forgery." K.S.A. 84-3-406 provides: "Any person who by his negligence substantially contributes ... to the making of an unauthorized signature is precluded from asserting the ... lack of authority ... against a drawee ... who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's ... business." Official UCC Comment 7 explains, "The most obvious case [of negligence which contributes to a forgery] is that of the drawer who makes use of a signature stamp ... and is negligent in looking after it."

The Court is convinced that Mid-American's negligence substantially contributed to Rosenbaum's forgeries of its checks. Shortly after hiring him, Mid-American turned over to him complete control of all its day-to-day finances. Rosenbaum not only kept the company's books, he was given access to its checks and Ewing's signature stamp, and received the company's mail every day. No one exercised sufficient control over his activities even to discover that apparently no bank statements were received in September or October, much less to discover that the company's books did not show the same balance as the bank statements. Rosenbaum was able to write unauthorized checks, both with and without the signature stamp, and intercept the bank statements without being discovered from the time he wrote the first unauthorized check on August 30 until a stranger to the company, the Radio Shack manager, questioned his authority to use a check in November. Even without the signature stamp, Rosenbaum would have been free to carry out his scheme at least for that period of time, apparently without fear of detection by Mid-American.

The Court notes that K.S.A. 84-3-406 also requires FSB to have paid the checks "in good faith and in accordance with the reasonable commercial standards" of its business. No direct evidence of FSB's procedures in paying these checks was presented. However, the Court believes these factors can become relevant only under circumstances where a bank's compliance with them would likely have led it to refuse to pay on unauthorized checks. Nothing about these checks themselves makes them suspicious from a processing bank's point of view. Three of them were payable to Rosenbaum himself, not peculiar since he was a company employee, and the amounts were certainly not large enough to arouse suspicion. Of the others, only the large one used to buy the car contained any information that might have indicated it was not being used to pay a Mid-American bill, the notation "Rosenbaum car loan." However, even here, it would have been at least as reasonable to assume the notation meant Mid-American was loaning Rosenbaum the money to buy a car as to think it

---

1. In 1991, the Kansas legislature completely replaced Article 3 and substantially revised Article 4 of the UCC, effective February 1, 1992. *See 1991 Kan.Sess.Laws 1686-1751.* Since the events at issue here all occurred well before that, the Court has applied the statutes in effect at the time of the events. Except where otherwise indicated, the citations in this decision to sections of Articles 3 and 4 are all to the 1983 bound K.S.A. volume compiled and edited by Ensley. The Court has not considered whether the changes to Articles 3 and 4 would change the conclusions reached in this opinion.

might mean he was embezzling the money. The use of a signature stamp on the checks of a company which had previously used the stamp could not have raised suspicions, so only those checks with hand-written signatures truly contained any evidence which might have raised a bank's suspicions. On the whole, the Court believes the hand-forgeries were done accurately enough that no commercially reasonable practice FSB might have employed to compare the signatures to a known signature would have been likely to spot Rosenbaum's hand-forgeries.

■ FSB also contends Mid–American's delay in notifying it of the forgeries precludes Mid–American from recovering for the forged checks. This argument is based on certain provisions of K.S.A. 84–4–406, which read:

> (1) When a bank sends to its customer a statement of account accompanied by items paid in good faith ... or otherwise makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature ... and must notify the bank promptly after discovery thereof.
>
> (2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank
>
> > (a) his unauthorized signature ... on the item if the bank also establishes that it suffered a loss by reason of such failure; and
> >
> > (b) an unauthorized signature ... by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature....

The Court believes FSB has misinterpreted subsection (2)(a), apparently reading it to mean in order to foist liability on a previ-ously-forged check onto its customer, all a bank has to show is that the customer waited too long to notify the bank after receiving the statement which showed the bank had paid on the check. As indicated in subsection (1), the statute applies only when the bank has paid on the check before sending the statement to the customer, so the "loss" caused by the customer's delay in reporting the forgery cannot be the bank's prior payment of the check. Instead, the bank must show, for example, that it lost an opportunity to recover from the forger, or probably more likely, from some bank up the line in the check collection process. Other than the fact it had already paid for the checks before Ewing reported the forgeries, FSB presented no evidence of any loss it suffered due to Mid–American's delay in reviewing its bank statement. Thus, K.S.A. 84–4–406(2)(a) does not enable FSB to shift liability to Mid–American on the forged checks it had paid before Mid–American's reporting time had expired.

Subsection (2)(b) of K.S.A. 84–4–406, however, does permit FSB to hold Mid–American liable for the Rosenbaum forgeries it paid more than fourteen days after it mailed the statement to Mid–American on September 1, 1988, which included the first item Rosenbaum had forged. The Court is not certain whether, under Kansas law, the fourteen-day period started running as soon as FSB mailed the statement or not until some mailing period had passed, but assumes any mailing time allowed would not be more than the three-day period provided by K.S.A.1992 Supp. 60–206(e). Thus, the inspection period allowed by subsection (2)(b) would have ended no later than September 18, and FSB paid on four more Rosenbaum forgeries after that date and before Ewing notified it of the forgeries. Mid–American's delay in reporting the first forgery, then, precludes it from asserting against FSB the unauthorized signatures only on those four checks.

■ The plaintiffs have cited no Kansas statute or case which does impose an implied duty of good faith and fair dealing on

948

the parties to a contract. They cite only K.S.A. 84–1–203, which declares "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." Nevertheless, the Kansas Supreme Court has indicated that K.S.A. 84–1–203 imposes a duty of good faith and fair dealing on parties to contracts governed by the UCC. *Morriss v. Coleman Co.*, 241 Kan. 501, 514–515, 738 P.2d 841 *(1987)*. Essentially, the plaintiffs contend FSB breached this duty by misrepresenting to them that Mid–American was liable on the checks Rosenbaum forged. Since the Court has determined any representation to that effect which FSB might have made was correct, the Court concludes FSB did not breach this duty. At the very least, FSB had a reasonable basis to believe Mid–American's negligence—and for the later checks, its delay in reporting the first forgery—*might* have precluded it from asserting Rosenbaum's unauthorized signatures against FSB. Even assuming FSB would have had a duty to inform the plaintiffs if it could not require them to pay for the checks under any circumstances, the Court is aware of no Kansas law which would impose a duty on FSB to inform the plaintiffs that they *might not* be liable on the checks.

For these reasons, the Court concludes the plaintiffs are not entitled to recover from FSB on any of their claims.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.

