COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
| --- | --- | --- |
| COMPASS BANK, | § | No. 08-12-00318-CV |
| Appellant, | § | Appeal from |
| | § | |
| v. | § | County Court at Law No. 3 |
| | § | |
| VICTOR NACIM AND | § | of El Paso County, Texas |
| RACHEL NACIM, | § | |
| | § | (TC # 2009-2946) |
| Appellees. | § | |

## **O P I N I O N**

The case arises from Victor and Rachel Nacim's substantial losses at the hands of David Peterson, a dishonest bank employee. A judgment was rendered against Peterson. That judgment has not been appealed and is not at issue here. Instead, Compass Bank, who employed Peterson, appeals the judgment against it. For the reasons stated below, we affirm.

### **FACTUAL SUMMARY**

Victor and Rachel Nacim opened accounts at State National Bank in October 2006. In March 2008, State National merged with Compass Bank. David Peterson worked for State National and later for Compass as a vice president doing commercial lending.

The Nacims met Peterson in 2006 when they moved their accounts to State National. Victor was involved in the wholesale car-buying business. He opened his checking account at

State National with a substantial balance. The couple's account activities were frequent, and by the nature of Victor's occupation, large deposits and withdrawals were transacted throughout the history of the account. They apparently mixed both business and personal transactions in their primary checking account.

The Nacims were treated as preferred customers and conducted their banking activities directly with David Peterson, or his assistant, Angie Soto, in his private office. Victor valued the personal service and referred several substantial real estate transactions to the bank.

*The Nacims' 2007 Transactions*

In early 2007, Rachel noticed a questionable $32,000 withdrawal from their primary checking account. She raised the issue with Victor, who did not recognize the transaction either. Rachel found the reference to the withdrawal on the February 2007 account statement that had been mailed to them by State National Bank. The account statement lists the withdrawal as a "miscellaneous debit." A photocopy of a "DDA Internal Debit" reflecting the $32,000 debit was also attached to the account statement. The debit memo does not show to whom the $32,000 was paid. It did show that David Peterson initialed the debit document.

Several days later, Victor went to see Peterson about the $32,000 debit. Peterson said it was a mistake and that he would take care of the problem. He assured Victor that the amount would be credited by the next month. But in April 2007, an additional $14,982 was debited from the Nacims' account. On April 17, Rachel noticed the new debit, and found that the $32,000 had not been repaid. She discovered these issues by looking at an on-line account statement. Victor went back to the bank to address these matters with Peterson. Peterson's assistant, Angie Soto, pulled the corresponding DDA Internal Credit memos that showed the funds had been

2

credited to a company called "Brute Force".[1]  Peterson told Victor that the two account numbers were very similar and that Peterson would close the Nacims' old account and open a new account to avoid these problems in the future.

In 2006 when the Nacims opened their accounts, they lived on Thunderbird Drive in west El Paso.  In October 2007, they moved into a new home on Turnberry Street.  State National financed their new mortgage and later a home equity loan for the new residence.  The Nacims retained an interest in the Thunderbird property but rented it to a third party.  They had limited access to mail sent to the Thunderbird address.  When the Nacims moved to their new residence on Turnberry, Rachel went to Peterson's office to ask that their mailing address be updated. At least for their checking account, State National and then Compass continued to carry the Thunderbird address as the official mailing address.  The Nacims testified that they continually complained and asked that the mailing address be changed.  Though Compass had the correct street address listed on several loans, on one of its computer fields, and in various deed records, it did not begin mailing account statements to Turnberry until August 2008.

In November 2007, Peterson drew $12,000 on one of Victor's lines of credit and deposited the money into the Brute Force account.  This transaction was not discovered until after this lawsuit was filed.

*The Nacims' 2008 Transactions*

In February 2008, Compass sent State National customers a letter notifying them of the merger of the two banks.  The mailing also contained a Deposit Account Agreement with new terms and conditions to govern the accounts.  The Agreement stated that: "[b]y opening your account, by conducting any transaction involving your account, or by maintaining your account

---

[1]  Brute Force was in fact a company nominally owned by one of David Peterson's high school friends.  Money put into this account was apparently accessed by Peterson for his own use.

after receipt of this agreement, you agree to the terms of this agreement." The merger of State National and Compass was completed by March 12, 2008.

In June 2008, Peterson approached Victor to discuss a "situation." He asked to borrow $45,000 for personal reasons. Peterson promised to repay the loan in three days. Victor was shocked by the request and told Peterson that he needed to speak with his wife. But before Victor could even speak with Rachel, Peterson informed him that he had already funded the loan out of the Nacims' account. Because Victor had many pending loans at the bank and felt vulnerable, he acceded to the loan. The $45,000 was deposited into a business account for "La Estancia." La Estancia was a business owned by the Peterson family that runs a restaurant in El Paso. It was common knowledge at the bank that Peterson had an interest in the restaurant.

The loan was not repaid in three days. Victor repeatedly confronted Peterson about when the money would be returned. Sometime in July 2008, he and Rachel were in Peterson's office. They were shown a computer screen which supposedly documented that $43,000 of the $45,000 loan had been repaid, and Peterson promised to repay the balance shortly. Peterson said the $43,000 would be reflected on their next monthly statement. At this time, the monthly bank statements were still being mailed to the Thunderbird address.

In August 2008, Victor Nacim learned that Peterson had left Compass. He called Peterson, who told him that none of the $45,000 had actually been repaid and that there were additional debits that Peterson had removed from the Nacims' account. The July bank statement, covering June 26 to July 28, reflected an unauthorized withdrawal of $34,000 which occurred on July 18. This statement was mailed to the Nacims on July 29, but was mailed to the Thunderbird address such that the Nacims never received it. The August statement, covering July 29 to August 26, reflected an unauthorized withdrawal of $9,617.64. For this transaction, Compass

4

had issued a cashier's check to "T&T Staff" dated August 8, 2008 but the debit memo to cover the funds taken from the Nacims' account was not made until August 21, 2008. The August statement was mailed to the Turnberry address and the Nacims acknowledge receipt. Victor met with the branch president, Ray Owen, on September 2, 2008. He informed Owen about the $45,000 loan in June, the $34,000 debit from July, and the $9,617.64 debit from August. Owen appeared to be familiar with Peterson's misdeeds. Victor was later asked to complete an affidavit documenting these amounts. When Compass failed to restore the amounts that the Nacims claimed were due them, they filed this lawsuit.

*Proceedings Below*

The Nacims filed suit against both David Peterson and Compass Bank. They originally based their claims only on the 2008 transactions: the June $45,000 loan, the July $34,000 withdrawal, and the August $9,617.64 withdrawal. Less than three months before trial, they amended their petition to include claims arising out of the 2007 withdrawals.

Compass obtained summary judgment on the claim involving the $45,000 loan based on the Nacims' having either consented to or ratified the loan. The trial court also found that all of the 2007 transactions were barred by limitations The Nacims do not challenge those rulings.

The case was tried to the bench over several days. Peterson did not attend the trial as he was incarcerated in federal prison. Prior to trial, he had pled guilty to several counts of bank fraud. The count relevant here, and to which he also pled guilty, alleged that since May 2007, Peterson had submitted debit slips in several different customer accounts so as to transfer money into accounts that Peterson held an interest, all without the consent of the account holders. Additional counts alleged different acts of bank fraud dating back to 2004.

Compass primarily defended the suit below on two theories. First, and as more fully

5

explained below, Compass contended that the Nacims delayed reporting the unauthorized withdrawals and that they were barred under the UCC as adopted in Texas for recovering these losses from the bank. Second, Compass via a counterclaim contended that the Nacims aided and abetted Peterson's actions, and that the withdrawals were actually kick-backs for loans that Peterson made to the Nacims or entities related to the Nacims.

The trial court found in favor of the Nacims on the claims for the July and August 2008 unauthorized withdrawals. It awarded those amounts along with attorney's fees and costs to the Nacims. The trial court did not find in favor of Compass on its counterclaim.

*Compass Bank's Appeal*

Compass Bank does not appeal the adverse findings on its counterclaim. Rather, in five issues it contends that the trial court erred in not awarding a portion of its litigation costs based on an offer of settlement (Issue One). It also contends that the trial court erred in failing to award attorney's fees and costs for defending against the 2007 withdrawals (Issue Two). Finally, it challenges the Nacims' recovery for the July and August 2008 withdrawals based on its contention that those claims are barred under TEX.BUS.&COM.CODE ANN. § 4.406(d)(1) and (2) (West 2002)(Issues Three, Four, and Five). We address these issues in a slightly different order for clarity.

### STANDARD OF REVIEW

This appeal proceeds with the benefit of findings of fact and conclusions of law. In a non-jury trial, the trial court is the fact finder and, as such, is the sole judge of the credibility of the witnesses. *Great American Ins. Co. v. Hamel*, 444 S.W.3d 780, 797 (Tex.App.--El Paso 2014, no pet h.), *citing Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-- Houston [1st Dist.] 1992, writ denied). The trial court's fact findings carry the "same force and

6

dignity" as would a jury's verdict. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991); *Heritage Resources, Inc. v. Hill,* 104 S.W.3d 612, 619 (Tex.App.--El Paso 2003, no pet.). The findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's verdict. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). Because Compass seeks only to have us reform the judgment, or render judgment in its favor, it only challenges the legal sufficiency of the trial court's findings of fact.

In a legal sufficiency review of the evidence, we consider the evidence in the light most favorable to the verdict. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008). The test for legal sufficiency "must always be whether the evidence at trial would enable [a] reasonable and fair-minded [fact finder] to reach the [result] under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Legal sufficiency review must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id*. An appellate court will sustain a legal sufficiency or "no-evidence" challenge, if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id.*at 822.

When the party with the burden of proof suffers an unfavorable finding, the inquiry is

7

whether the fact was established as "a matter of law." *Serrano v. Union Planters Bank, N.A.,* 162 S.W.3d 576, 580 (Tex.App.--El Paso 2004, pet. denied). When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id.; In re Estate of Livingston,* 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no pet.).

When a party appeals from a non-jury trial, it must complain of specific findings and conclusions. *Carrasco v. Stewart,* 224 S.W.3d 363, 367 (Tex.App.--El Paso 2006, no pet.); *see also Serrano*, 162 S.W.3d at 580. A general complaint against the trial court's judgment does not present a justiciable question. *Carrasco,* 224 S.W.3d at 367; *Serrano,* 162 S.W.3d at 580. If the appellant does not challenge the trial court's findings of fact, these facts are binding upon both the party and the appellate court. *Serrano,* 162 S.W.3d at 580.

We review the trial court's conclusions of law *de novo*. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 322 (Tex.App.--El Paso 1995, writ denied). We review *de novo* the construction of rules and statutes. *Pacific Employers Ins. Co. v. Torres*, 174 S.W.3d 344, 346 (Tex.App.--El Paso, 2005, no pet.). We also review *de novo* a trial court's application of uncontested facts to the law. *Id.*; *NCED Mental Health, Inc. v. Kidd*, 214 S.W.3d 28, 32 (Tex.App.--El Paso, 2006, no pet.). But when the question before the court is the application of disputed facts to the law, our standard of review, at least with regard to the contested facts, is abuse of discretion. *Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999)(mixed question of law and fact for award of attorney's fees under the Frivolous Claims Act); *see also Delfingen US-Texas, L.P. v. Valenzuela*, 407 S.W.3d 791, 799-800 (Tex.App.--El Paso 2013, no pet.)(abuse of discretion standard applied in mixed question of law and fact for determining whether an arbitration

8

agreement is unconscionable). With these standards in mind, we turn to the issues on appeal.

## BUSINESS & COMMERCE CODE SECTION 4.406

Our starting point is TEX.BUS.&COM.CODE ANN. § 4.406. That section, adopted from the UCC, allocates the risks from unauthorized transactions in a customer's bank account. *American Airlines Employees Federal Credit Union v. Martin,* 29 S.W.3d 86, 91 (Tex. 2000). A bank can only charge against a customer's account "an item that is properly payable." TEX.BUS.&COM. CODE ANN. § 4.401(a). An item is properly payable only if it is "authorized by the customer" consistent with the terms of the party's banking agreement. *Id.* But because a bank can process thousands of transactions a day, the UCC had to devise a system to handle those questionable transactions where a customer may not have actually authorized a payment. *Martin,* 29 S.W.3d at 92. The UCC's answer to this problem is premised on the concept that the customer is in the best position to know which transactions were authorized, and which were not. *Id.* Using this concept, Section 4.406 details both the customer's and the bank's duties.

First, Section 4.406(a) outlines the bank's duties with regard to providing the customer sufficient information to detect an unauthorized transaction. It requires the bank to send or "make available" an account statement showing any "items paid." *Id.* The account statement can either return the actual items paid or otherwise provide "sufficient information" to allow the customer to reasonably identify them. *Id.* The bank provides sufficient information if it gives the customer an image of the item paid. *Id.* at cmt.1. A statement also provides sufficient information "if the item is described by item number, amount, and date of payment." *Id.* at § 4.406(a). When the bank does not actually return the items paid, it must provide a means for the customer to contact the bank to get a legible copy of the item.[2]

---

[2] TEX.BUS.&COM.CODE ANN. § 4.406(b) details how long the bank must retain the items and the how they are to be returned.

If the bank discharges it duties under Section 4.406(a), then section 4.406(c) burdens the customer with the duty to inspect the account statement and report any unauthorized payment:

> If a bank sends or makes available a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

TEX.BUS.&COM.CODE ANN. § 4.406(c)(West 2002). A customer who does not detect and report an unauthorized transaction can be barred from making a claim on those items in one of two ways. First, TEX.BUS.&COM.CODE ANN. § 4.406(d)(1) precludes any claim which asserts "the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure[.]" An unauthorized signature could include a bank employee signing with the purported permission of an authorized signatory. *Martin,* 29 S.W.3d at 93.

Additionally, if customers fail to report an unauthorized signature or alteration, they risk losing the right to pursue future claims when the questionable transactions arise from the same wrongdoer. TEX.BUS.&COM.CODE ANN. § 4.406(d)(2) bars any claim when:

> [T]he customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

A bank's defense both under Section 4.406(d)(1) and (2) has three potential limitations. First, neither defense applies if the bank does not comply with Section 4.406(a) and send or make available a statement with either the paid items, or information sufficient to allow the customer to identify those items. *Id*. at cmt.1. Second, neither of the exclusions apply if the

10

customer shows that the item was not paid in good faith. TEX.BUS.&COM.CODE ANN. § 4.406(e). Third, if the customer can show the bank "failed to exercise ordinary care in paying the item and that the failure contributed to loss" then the loss is handled as a comparative negligence issue with each party being responsible for their proportionate share of the loss. *Id*.[3] Finally, TEX.BUS.&COM.CODE ANN. § 4.406(f)(West 2002) provides an effective one year statute of repose on any unauthorized item or alteration from the date the bank statements are made available to the customer. *Id*.; *Federal Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012).

With certain limitations not relevant to this dispute, the parties may alter terms of the UCC's reciprocal duties. For instance, the length of time during which a customer can bring to a bank's attention a questionable transaction can be shortened by agreement. In *American Airlines Employees Federal Credit Union v. Martin*, the court upheld a credit union customer agreement which shortened the one year repose period in Section 4.406(f) to sixty days. *Martin,* 29 S.W.3d at 97. The *Martin* court cites to several cases approving even more restrictive modifications of the Section 4.406 time periods. *Id*. at 97 n.58.

*Compass Bank's Section 4.406 Defenses*.

Compass contends in Issues Four and Five that Section 4.406 bars the Nacims' claims relating to the July and August 2008 transactions. It claims that the July 2008 transaction was reported no earlier than the September 2 meeting between Victor and Owen. The July bank statement which referenced that transaction was mailed on July 29, 2008. The September 2 meeting would thus be the 33rd day following the date Compass mailed the Nacims the July

---

[3] The trial court found that Compass was 80% at fault, that Peterson was 15% at fault, and that the Nacims were 5% at fault. Compass asks that we reform the judgment in accordance with these percentages of fault. Given our disposition of the applicability of the Section 4.406 scheme, we do not reach this issue, nor the issue regarding the sufficiency of the evidence to support the negligence finding.

bank statement. Compass contends that its Deposit Account Agreement mailed to the Nacims in February changed Section 4.406(a) so to impose an absolute thirty day time limit for reporting claims. The Nacims were therefore three days late in reporting the questionable transaction.

With regard to the August 2008 transaction, Compass contends that the late reporting of the July transaction bars the Nacims from recovering on the August transaction because both withdrawals were made by the same wrongdoer. Section 4.406(d)(2) bars a claim when a customer fails to report an unauthorized transaction and the same wrongdoer later commits another theft. Related to both defenses, Compass maintains there is no evidence to support the negligence (lack of ordinary care) findings made by the trial court. Overarching all these claims is the contention that any common law duties the bank may owe are supplanted by Section 4.406 and its system of customer/bank duties and responsibilities.

We initially agree that when Section 4.406 applies to a situation, it supplants any inconsistent common law duties. *See Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 764 (Tex. 1982); *Signal Oil & Gas Co. v. Universal Oil Products.*, 572 S.W.2d 320, 330 (Tex. 1978); *Miller-Rogaska, Inc. v. Bank One Texas*, N.A., 931 S.W.2d 655, 662 (Tex.App.--Dallas 1996, no writ). The statute retains common law principles of law and equity, "[u]nless displaced by the particular provisions of this title . . . ." TEX.BUS.&COM.CODE ANN. § 1.103 (b)(West 2009). If the comprehensive system of reciprocal duties under Section 4.406 applies on these facts, they would displace any existing common law treatment of the issues raised here.

### Does Section 4.406 Apply on These Facts?

The Nacims raise three issues questioning whether Section 4.406 applies on these facts: whether the debit memo is an "item" or "item paid"; whether Compass suffered a loss; and whether the Deposit Account Agreement is ambiguous. We address each claim in turn.

12

**The Debit Memo is an "Item Paid" Within the Meaning of Section 4.406**

While Compass contends Section 4.406 applies and acts as a bar for the 2008 transactions, the Nacims respond that because Peterson withdrew their funds with a "debit memo," Section 4.406 cannot apply. Section 4.406 deals with "items" and a "debit memo" is not an "item." An "item" is a defined term and means "an instrument or a promise or order to pay money handled by a bank for collection or payment." TEX.BUS.&COM.CODE ANN. § 4.104(9). We agree that a debit memo is neither an "instrument" nor a "promise to pay." The question is whether it is an "order to pay" and thus falls with the scope of Section 4.406.

An "order" is further defined in TEX.BUS.&COM.CODE ANN. § 3.103(6) as "a written instruction to pay money signed by the person giving the instruction." *Id*. The debit memos used by Peterson were "instructions" to pay from a customer's deposit account. The debit memo is not necessarily signed by the customer, but can be signed on the customer's behalf by a bank employee. Peterson would fill out the debit memo, drop it off with a teller who would then send it to a "proof" department which would execute the instruction to move the funds out of the Nacims' account. The debit memo only directs that funds be moved out of a customer's account. There should also be a corresponding credit memo on the same day directing where the funds are ultimately routed. The Nacims raise one principle argument contesting whether the debit memo is an order to pay. They contend that because the debit memo is only half the transaction--it only operates to pull money out of an account and does not direct where it ultimately is paid--that it cannot be an order to pay.

We reject this contention. The commentary to Section 4.104 and the Texas Supreme Court direct us to read the term "item" broadly. TEX.BUS.&COM.CODE ANN § 4.104 cmt.8; *Martin*, 29 S.W.3d at 92-93 (citing cases from other jurisdictions finding deposit slips, savings

13

account withdrawal orders, and handwritten notes asking for cashiers' checks to be "items"). In the *Martin* case itself, the Texas Supreme Court found a journal entry to be an item; the journal entry directed that funds be taken from a customer's account and put in another account. *Id.* The journal entry was signed by a bank employee taking verbal instructions from someone thought to be authorized on the account. *Id.* The Nacims attempt to distinguish *Martin*. They note that the journal entry there identified the specific account to which the transfer was made, while here the debit memo is silent on the ultimate destination of the funds. We would agree that the absence of the corresponding credit memo is significant to whether the bank has provided the Nacims sufficient information to allow them to reasonably identify items paid in their account, but it does not disqualify the debit memo from being an "item." The debit memo itself still directs that funds were to be taken from the Nacims' account and is an order to pay, wherever the funds may ultimately be directed.

The Nacims similarly argue that Section 4.406(a) only applies to "items paid" and that the debit memo, without the corresponding credit memo, is therefore not "paid." The Nacims cite no case for this proposition and we have found none. The debit memo itself directs the removal of funds from their account; the funds would necessarily go somewhere, whether to be held temporarily by the bank or as a part of a larger transaction. We certainly understand how customers who look at an account statement, and seeing a withdrawal that they do not recognize, would first want to see the identity of the payee. The absence of the payee information may well be relevant to whether a bank has provided sufficient information to allow the customer to identify items paid, but the trial court made no findings that Compass failed to meet the informational requirements in Section 4.406(a) and that issue is not before us.

## Compass Bank Failed to Prove it Suffered a "Loss"

Next, the Nacims contend that Compass Bank did not suffer a loss. Indeed, the trial court made a specific finding that only the Nacims, and not Compass, suffered a loss. This finding is significant because the defense in Section 4.406(d)(1) precludes any claim for an unauthorized withdrawal, but only "if the bank also proves that it suffered a loss by reason of the failure" of the customer to make a timely report. *Id*. at § 4.406(d)(1)

Neither the Nacims nor Compass direct us to any authority defining what "loss" is contemplated by Section 4.406(d)(1) and we find scant authority ourselves. Compass argues that the payment of the questionable item is itself the loss because a bank has liability to its depositors for all funds that it holds on deposit. But that logic would make the language of the statute a redundancy. If every item that is improperly paid creates a loss for the bank, why would the Legislature have added the specific language requiring the bank to prove that it suffered a loss from the customer's failure to report the item? "We presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011). "It is settled that every word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible." *Texas Workers' Compensation Ins. Fund v. Del Indus., Inc.,* 35 S.W.3d 591, 593 (Tex. 2000).

A federal bankruptcy court has reasoned that the loss must be something collateral, such as the bank losing "an opportunity to recover from the forger, or probably more likely, from some bank up the line in the check collection process." *In re Mid-American Clean Water Systems, Inc*., 159 B.R. 941, 947 (D.C. Kan. 1993). Applying that logic here, Compass would

have to show that the alleged three day delay by the Nacims in reporting Peterson's activities cost Compass some chance to recover funds from Peterson, or avert some other loss. Compass mailed the July account statement on July 29, 2008. Under the Bank's view of the deposit agreement, the Nacims had until August 28 (thirty days from July 29th) to report the account discrepancy. But the record shows that Compass had terminated Peterson on August 26, 2008, which would be two days before the Nacims would have had to report the questionable transaction. Given this sequence of events, Compass has not established as a matter of law that it suffered a loss as contemplated by Section 4.406(d)(1).

Moreover, Compass Bank does not expressly challenge the trial court's finding that it did not incur a loss generally, and it makes no complaint that the trial court failed to make a finding that it suffered a loss based on the three day delay. At best, the testimony below as to whether Compass suffered any loss is conflicting. Because there is some evidence supporting the finding that it suffered no loss, we uphold that finding. And without a finding of its own loss, the defense in Section 4.406(d)(1) does not apply. We therefore overrule the issue germane to the July 18th withdrawal in Issue Four.

### The Deposit Account Agreement is Ambiguous

Under Section 4.401(a), the bank triggers the customer's duty to inspect and report questionable items when it "makes available" a sufficient account statement. But a bank may amend, within limits, that statutory language. *Martin,* 29 S.W.3d at 92. Here, Compass contends its customer agreement changed not only the time limits for reporting a questionable item, but also other matters such as the definition of the term "item" and how items must be described to the customer. The Nacims argued below, and obtained findings to support their contention, that the additional terms created an ambiguity as to when the reporting requirement

16

of Section 4.406 (d) began to run.

Whether a contract is ambiguous is a question of law. *Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex. 1996). If the contract is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and a court should construe the contract as a matter of law. *SAS Institute, Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex. 2005); *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997). "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Heritage Resources*, 939 S.W.2d at 121.

Not every difference in the interpretation of a contract amounts to an ambiguity. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex. 1994). Mere disagreement over the meaning of a provision in the contract does not make the terms ambiguous. *Richardson Lifestyle Association v. Houston,* 853 S.W.2d 796, 800 (Tex.App.--Dallas 1993, writ denied). We determine whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 746 (Tex. 2003).

When a contract does contain an ambiguity, the interpretation of the instrument becomes a fact issue. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983); *Quality Infusion Care, Inc. v. Health Care Service Corp.,* 224 S.W.3d 369, 379 (Tex.App.--Houston [1st Dist.] 2006, no pet.). The trier of fact must resolve the ambiguity by determining the true intent of the parties. *Coker,* 650 S.W.2d at 394-95.

The Deposit Agreement requires (at least in some provisions) that the customer report questionable transactions once the customer *actually receives* the account statement. The Agreement provides:

17

You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send the statement or notice to you, you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we send the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item, or paying any other item altered or forged by the same wrongdoer if we paid the other item before we received notice of any of these exceptions from you.

The ambiguity arises from the first and second sentences which trigger the duty to report questionable transactions after the customer receives the account statement, and the last two sentences which trigger the thirty day period from the date the statement is mailed. It creates the anomaly that the duty to inspect and report could begin after the thirty day period expires if the customer does not receive the mailed account statement. The Nacims argued below, and the trial court so found, that they did not receive their account statement because they had changed addresses and Compass failed to change the mailing address in its system.

Other banks have altered the Section 4.406 time limits, but preserved the "made available" trigger date found in Section 4.406(a). *Coffey v. Bank of America*, 2013 WL 257363, *5 (Tex.App.--Beaumont, January 24, 2013, no pet.)(mem. op.)(per customer agreement, sixty day repose period which ran "after we send your statement or items, or otherwise make them available"); *Lone Star Nat. Bank v. Martinez*, 2010 WL 1138450, *3 (Tex.App.--Corpus Christi, March 25, 2010, no pet.)(mem. op.)(customer agreement imposing sixty-day repose period from "when we make the statement available"*).* If we are to engage in the fiction that customers actually read and agree to the modified terms and conditions of their account agreements, and enforce those provisions which favor the bank, then we must also apply those which work to the bank's detriment. If Compass had modified only the time limits of Section 4.406, and not

18

attempted to modify the date for when the time limit runs, our view might be different. But having created an ambiguity where none existed before, the trial court had to determine the true intent of the parties. It found that actual receipt of the customer statement is required by the contract and there is some evidence to support that finding.

Nor can we credit Compass Bank's argument that the "made available" language of Section 4.406(a) obviates any issues with its customer agreement. Once Compass altered the provisions of Section 4.406 through its customer agreement, it could no more go back and rely on the favorable provisions of Section 4.406 than could the Nacims rely on the Section 4.406 terms that were superseded through the customer agreement. So whether the account statement was made available by mail, through its branch banks, or on-line, at least some sections of the customer agreement stated that the Nacims duty to inspect and report questionable items began once they received the statement. That the statute would impose a more onerous duty on the Nacims is irrelevant once Compass sought to contractually change the statutory scheme.

*Compass Bank Failed to Prove its Entitlement to the Section 4.406 Defenses.*

We overrule Issue Three which asserts that Section 4.406 bars the Nacims from recovering for the July 2008 withdrawal. We do so for the two reasons outlined above. First, Compass did not prove that it suffered a loss as required by Section 4.406(d)(1). Second, because of the ambiguity in the agreement, there is no date certain from when the thirty day time period in the Deposit Account Agreement begins to run.

We additionally overrule Compass Bank's Issue Five with regard to the "repeated wrongdoer" defense in Section 4.406(d)(2). Compass seeks to apply the "repeated wrongdoer" rule in Section 4.406(d)(2) as a bar to the Nacims' recovery for the August 25 withdrawal. Its argument is premised solely on the claimed failure of the Nacims to timely report the July

19

withdrawal. Because we uphold the trial court's findings that the duty to report the July withdrawal did not arise because of the ambiguity in the Deposit Account Agreement, it could not operate to trigger a time line under the repeated wrongdoer rule.

Finally, Compass complains of the trial court's findings that it failed to exercise ordinary care when it paid the July and August transactions. The failure to exercise ordinary care is relevant only to the extent that Sections 4.406(d)(1) or (2) apply. In light of our holding that those provisions were never triggered, the negligence finding is moot. We therefore overrule Issue Five.

## OFFER OF SETTLEMENT

In Issue One, Compass complains that the trial court erred in not applying the offer of settlement rule found in TEX.R.CIV.P 167 and TEX.CIV.PRAC.&REM. CODE ANN. § 42.005(a)-(b) (West 2008). That statute, and the rule promulgated under it, permit a party to make an offer of settlement and if the eventual verdict is "significantly less favorable"--a defined term--then certain costs of litigation can be shifted to the party refusing the offer. TEX.R.CIV.P 167.4(b) Here, Compass contends the judgment eventually awarded to the Nacims was significantly less favorable than its pretrial offer to settle the case. The resolution of this issue turns on our construction of the statute and the standard of review to be applied.

As noted above, we review *de novo* the construction of rules and statutes, and the application of uncontested facts to the law. *Torres*, 174 S.W.3d at 346. But when the question before the court is the application of disputed facts to the law, our standard of review, at least with regard to the contested facts, is abuse of discretion. In *Brainard v. State*, 12 S.W.3d 6 (Tex. 1999), for instance, the court reviewed an award of attorney's fees under the Frivolous Claims Act. To award fees under that enactment, the trial court must make a finding that the state's

actions were "unreasonable" which is a mixed question of law and fact, and one reviewable under an abuse of discretion standard. *Id*. at 30.

*Compass Bank's Argument.*

On October 11, 2011, Compass offered $75,000 to the Nacims to settle this dispute. Compass had earlier invoked the offer of settlement rule under Rule 167 by filing an appropriate declaration. The offer was not accepted. The amount of the judgment awarded to the Nacims on its face is $92,937.64 exclusive of pre-judgment interest and costs, which exceeds the offer. Under Rule 167, certain litigation costs can be shifted to the party making a claim, but only if "the judgment would be less than 80 percent of the offer." TEX.R.CIV.P. 167.4(b)(1). Here, the judgment would need to be no more than $60,000 to meet the 80% "significantly less favorable" threshold as set by the rule.

But Compass argues that when a party's claim includes a variable that increases as the litigation drags on, such as attorney's fees, the amount of the attorney's fees must be ascertained and applied as of the date of the settlement offer, and not as of the date of the trial. This issue has not been addressed by a Texas court applying Rule 167. Compass points to several federal and out of state cases applying similar, but not identical rules. *E.g. Marek v. Chesny,* 473 U.S. 1, 7, 105 S.Ct. 3012, 3015-16, 87 L.Ed.2d 1 (1985)(applying Fed.R.Civ.P. 68); *Chartier v. Weinland Homes, Inc*., 25 P.3d 1279, 1281 (Colo. Ct. App. 2001)(post-offer attorney's fees should not be considered for purposes of comparing to offer, but amount of pre-offer attorney's was unclear from record and case was remanded). Those case hold that under the respective rules at issue, the relevant date for determining the amount of attorney's fees is the date of the offer, and not the date the case is eventually tried.

Compass then argues that there was a stipulation as to the amount of the attorney's fees

21

which had been incurred as of the date of the settlement offer, thus making the amount of the Nacims' attorney's fees uncontested. Weaving these threads together, Compass then concludes that the amount of a judgment as of the date of the settlement offer would have been less than 80% of its settlement offer.[4]

*The "Stipulation" on Attorney's Fees.*

Compass Bank's argument relies heavily on what it contends was a stipulation as the amount of the Nacims' attorney's fees incurred as of the date of the offer. At trial, counsel for both parties asked for a short recess to see if they could reach an agreement regarding attorney's fees. After the recess, both counsel testified to their respective qualifications, the hours expended by the attorneys and paralegals on both sides, the respective hourly rates, and how their fees could be allocated to the various claims asserted or being defended. As a part of an agreement between both sides, neither counsel cross-examined each other. They also both agreed to discount their fees. The Nacims' attorney apparently applied a 25% reduction across the top of his fees. The record shows this was less a stipulation about recoverable attorney's fees, and more of an agreement that both counsel could testify without cross-examination. The agreement arose in part "in order to expedite" the proceedings and avoid a "prolonged hearing."

The net effect of the agreement might well be that for certain issues concerning attorney's fees, one counsel or the other's testimony might be the only evidence in the record. But this was not a stipulation that any particular amount testified to was binding on the trial court.

In addition to its counsel's testimony, the Nacims' attorney's fees evidence came from three exhibits. Exhibit 29 is a compilation of all the periodic billing statements sent to the Nacims from the case's inception to October 10, 2012. That invoice reflects billings in excess of

---

[4] The actual damages for the July and August 2008 withdrawals totaled $43,617.64. Compass contends the stipulated attorney's fees were $8,610 and it recalculated the accrued prejudgment interest to be $4,977.19. The total of these figures is $57,204.83 which is 76.27% of the $75,000 offer.

$42,000 as of the time of the settlement offer.  Exhibit 30 is a summary of the total fees which allocates the time and expenses between the claims asserted against Peterson and those against Compass.  This compilation also contains a discount, per the agreement reached at trial, and provided that the Nacims were seeking $80,000 against Compass Bank, with 60% of that allocated to the breach of contract claim ($48,000), and 40% allocated to the negligence claim and defense of the counterclaim asserted against them.

Finally, Exhibit 31 further breaks down the $48,000 allocated to the breach of contract claim by time period.  On the face of the exhibit, there is a total for the time and expense attributable to three time periods:  November 1, 2011 to December 1, 2011; December 2 to May 20, 2012; and June 2012 to trial.  Specific figures are stated for each of those periods.  There is no specific figure stated for the fees and expenses before November 1, 2011 which was the date of the settlement offer.  Instead, to find that number, one needs to subtract the subtotals for the three time periods on Exhibit 31 from the total of $48,000 attributed to the contract claim.  The residual amount totals $8,610 which is the amount Compass represents as the stipulated pre-settlement offer attorney's fees attributed to the claims against it.[5]

Compass did not request any findings by the trial court as to amount of the Nacims' attorney's fees as of the date it made its offer. The findings of facts and conclusions of law do not address the offer of settlement issue.  Indeed, Compass never raised the offer of settlement issue until it filed its motion to modify the judgment.  The motion was never set for hearing and was overruled by operation of law.  While the motion refers to the amount of attorney's fees as a stipulated sum, the record is less clear.

---

[5]  A footnote in Compass Bank's brief is the first place we can find in the record where the math to arrive at the "stipulated" pre-offer attorney's fee amount is set forth.  The Bank's motion to modify the judgment merely states that the Nacims stipulated that $8,610 was the amount of attorney's fees through the date of the settlement offer. The motion does not explain how that figure is arrived at, and as noted, neither the testimony nor the exhibits reflect this number.

23

Assuming without deciding that the amount of attorney's fees as of the date of the offer is determinative, we are disinclined to find that the trial judge abused his discretion in finding the offer was significantly less favorable than the amount awarded. First, the stipulation that Compass refers to was simply an agreement that the attorneys would testify without cross-examination. The agreement apparently included a compromise that reduced the fees sought, but that compromise occurred at the time of trial, and not at the time that Compass Bank's offer was made. Nothing in their agreement suggests the amounts were meant to apply retroactively. The testimony at trial also included Exhibit 29 which supported a much higher fee than the amount Compass claims was stipulated to as of the date of the settlement offer. Before we can fault the trial court for not applying Rule 167 in this case, we believe it was incumbent on Compass to actually bring this issue to the attention of the trial court and obtain definitive findings as to amount of attorney's fees which were incurred as of the date of the rejected settlement offer. This it failed to do.

## COMPASS BANK'S CLAIM FOR ATTORNEY'S FEES

In March 2012, the Nacims' amended their pleadings to assert claims for certain losses which occurred in 2007. Compass prevailed on having these particular claims dismissed based on the statute of limitations. It contends that the customer account agreement in effect in 2007 provided that the Bank can recover attorney's fees as a prevailing party. Because it prevailed on these claims, Compass asks us to reform the judgment so that it recovers some $42,189.50 in attorney's fees attributable to resisting the 2007 claims.

The trial court found that Compass failed to plead or prove that it was entitled to recover attorney's fees. With regard to pleadings, the general rule is that unless attorney's fees are mandated by a statute, a party must properly plead for them. *Bailey v. Rodriguez*, 351 S.W.3d

24

424, 426 (Tex.App.--El Paso 2011, no pet.); *R. Conrad Moore & Associates, Inc. v. Lerma,* 946 S.W.2d 90, 96 (Tex.App.--El Paso 1997, writ denied). In this case, the parties dispute what constitutes an appropriate pleading.

In an amended pleading filed October 20, 2011, Compass asserted a general denial, various affirmative defenses, a cross claim against Peterson, and a counterclaim against the Nacims. The counterclaim alleged two theories: aiding and abetting breach of a fiduciary duty, and fraud. The factual basis of the counterclaim related to the Bank's claim that the Nacims were receiving kickbacks in exchange for obtaining favorable treatment on loan applications. In it prayer for relief, Compass sought unspecified actual damages along with "exemplary damages, attorney's fees, post-judgment interest, and all courts [sic] of court" from the Nacims. Compass contends this pleading is sufficient to support an award of attorney's fees.

There is authority that a general request for attorney's fees in a prayer for relief is enough to authorize the award of attorney's fees. *See Tull v. Tull*, 159 S.W.3d 758, 762 (Tex.App.--Dallas 2005, no pet.), *citing Morgan v. Morgan*, 657 S.W.2d 484, 491 (Tex.App.--Houston [1st Dist.] 1983, writ dism'd)(holding that a prayer and stated basis in the pleading were sufficient to raise attorney's fee claim). But we find the discussion in *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877 (Tex.App.--Dallas 2009, no pet.) more instructive and in line with our precedence. In *Alan Reuber,* one dealership sued another for breach of contract and specifically sought attorney's fees under the contract. *Id*. at 881. The other dealership's answer denied the breach and contained a request for attorney's fees, but did not make a specific reference to the contractual provision allowing for recovery of attorney's fees. *Id*. The prayer for relief was sufficient because the answer, read in conjunction with the plaintiff's petition in that case, gave fair notice of the basis for the attorney's fee claim.

25

Texas follows the "fair notice" standard--a party should be able to determine from the pleadings "the nature, basic issues, and the type of evidence that might be relevant to the controversy." *Low v. Henry,* 221 S.W.3d 609, 612 (Tex. 2007). Accordingly, a general prayer for relief will not always support an award of attorney's fees. *Alan Reuber*, 287 S.W.3d at 885, *citing Kissman v. Bendix Home Sys., Inc.,* 587 S.W.2d 675, 677 (Tex. 1979)("The prayer for general relief is of no assistance [in giving fair notice of a claim] because a prayer must be consistent with the facts stated as a basis for relief."). Instead, the pleading should state the legal basis or the facts upon which the attorney's fee claim is premised. *Bailey v. Rodriguez*, 351 S.W.3d 424, 426 (Tex.App--El Paso 2011, no pet.). Alternatively, the facts supporting the attorney's fee claim should be evident from the opponent's own pleadings. *Alan Reuber*, 287 S.W.3d at 885; *see also Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756 (Tex. 1980)("In determining whether issues are supported by pleadings, the trial court will supply omissions in the pleadings of one party by referring to the allegations contained in the pleadings of another."). We find none of these standards met by the Bank's amended answer and counterclaim.

The amended answer and counterclaim which first contained a prayer for attorney's fees did not plead any facts germane to the 2007 transactions, including the Deposit Agreement, or its contractual provision for attorney's fees. And when that counterclaim was first filed, there was no pending issue with regard to the 2007 transactions. It was some five months later that the Nacims amended their pleadings to raise the 2007 unauthorized withdrawals by Peterson.[6]

We fail to see how the bare request for attorney's fees, first filed at a time when the 2007

---

[6] We acknowledge that after the Nacims amended their petition to add the 2007 claims, Compass filed another amended answer, identically captioned as "Compass Bank's Second Amended Answer, Counterclaim, and Cross-Claim." This pleading adds an affirmative defense of statute of limitations, but does not change the counterclaim in any way, or mention the 2007 agreement as a basis for the attorney's fees.

transactions were not at issue, provides fair notice that Compass was seeking its attorney's fees for defense of the Nacims' 2007 losses. We agree with the trial court's finding that there were no pleadings to support its claim for attorney's fees.

Compass alternatively claims that even if not pled, its claim for attorney's fees was tried by consent. When issues not raised by the pleadings are tried by consent, they must be treated in all respects as if they had been raised in the pleadings. TEX.R.CIV.P. 67; *Phillips v. Phillips*, 296 S.W.3d 656, 670 (Tex.App.--El Paso 2009, pet. denied); *Gutierrez v. Gutierrez,* 86 S.W.3d 721, 729 (Tex.App.--El Paso 2002, no pet.). This rule applies to those exceptional cases when it clearly appears from the record as a whole that the parties tried an unpled issue by consent. *Gutierrez,* 86 S.W.3d at 729. It is not a general rule of practice; it should be applied with care, and never in a doubtful situation. *Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.,* 223 S.W.3d 1, 18 (Tex.App.--El Paso 2005, pet. denied). Trial by consent "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Id., quoting Johnston v. McKinney American, Inc.,* 9 S.W.3d 271, 281 (Tex.App.--Houston [14th Dist.] 1999, pet. denied). To determine whether the issue was tried by consent, the court must examine the record not for evidence of the issue, but rather for evidence of *trial* of the issue. *Marrs and Smith Partnership,* 223 S.W.3d at 18.

As support for its claim that the attorney's fee issue was tried by consent, Compass points to its counsel's testimony. The attorney made a point of segregating those fees attributable to defense of the 2007 transactions because he claimed a right to recover those fees by virtue of having prevailed on the 2007 claims. The Nacims respond that Compass failed to seek a trial amendment. TEX.R.CIV.P. 67 would not require a formal amendment in a non-jury trial. It allows for trial amendments, but states that the "failure so to amend shall not affect the result of

the trial of these issues; provided that written pleadings, before the time of submission, shall be necessary to the submission of questions, as is provided in Rules 277 and 279." Rules 277 and 279 apply to jury trials, and by implication, no formal trial amendment would be required in a non-jury trial.

But we are more troubled by the "stipulation" under which the attorney's fee testimony was admitted. Both counsel stated several times on the record that while they agreed that each could testify to what their attorney's fees would be, both expressly reserved the right to contest that either was entitled to attorney's fees. With this reservation, we cannot conclude that the mere inclusion of testimony as to the amount of attorney's fees attributable to defense of the 2007 transactions would constitute trial by consent.

Looking to the record as whole, there is no mention of a claim for attorney's fees under the 2007 customer agreement in Compass Bank's pretrial filings.[7] In the opening statements to the trial court, Compass Bank's counsel claimed his client was seeking its attorney's fees and costs as matter of "equity" because the Nacims' lawsuit was "baseless." There were no findings of facts on the application of the 2007 agreement to these facts, and no findings on the amount of attorney's fees referable only to the defense of the 2007 claims. Based on this record, we cannot conclude that this case is one of those exceptional situations where an issue was actually tried, much less by consent. Issue Two is overruled.

## CONCLUSION

We overrule Issues One, Two, Three, Four, and Five and affirm the judgment below. We award the Nacims' the conditional attorney's fees for the appeal of this matter as provided in the trial court's judgment.

---

[7] Compass filed shortly before trial "Compass Bank's Statement of Legal Matters To Be Decided By The Court" and "Statement of Contentions, Contested Issues of Fact, And Issues To Be Tried To The Jury."

28

January 14, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, Rodriguez, J., and Chew, C.J. (Senior Judge)
Chew, C.J. (Senior Judge), sitting by assignment