ACCEPTED
01-15-00210-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
8/10/2015 5:34:09 PM
CHRISTOPHER PRINE
CLERK

No. 01-15-00210-CV

## *IN THE*

## *FIRST COURT OF APPEALS*

## *HOUSTON, TEXAS*

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

8/10/2015 5:34:09 PM

CHRISTOPHER A. PRINE
Clerk

FRANCISCO CALLEJA-AHEDO

Appellant

V.

COMPASS BANK

Appellee

On Appeal from the 55th District Court
Harris County, Texas

Trial Cause No. 2014-22168

## APPELLANT'S BRIEF

Michael C. O'Connor
State Bar No. 15187000
Lesley C. O'Connor
State Bar No. 24086952
O'CONNOR, CRAIG, GOULD & EVANS
2500 Tanglewilde, Suite 222
Houston, TX 77063
713-266-3311
713-953-7513 (fax)

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

1.     Francisco Calleja-Ahedo                         Plaintiff, Appellant
       12000 Sawmill Rd. Apt. 2216
       The Woodlands, Texas 77380

2.     Compass Bank                              Defendant, Appellee

### Plaintiff's-Appellant's Trial and Appellate Counsel:

| | |
|---|---|
| Michael C. O'Connor | Lesley C. O'Connor |
| O'Connor, Craig, Gould & Evans | O'Connor, Craig, Gould & Evans |
| State Bar No. 15187000 | State Bar No. 24086952 |
| 2500 Tanglewilde, Suite 222 | 2500 Tanglewilde, Suite 222 |
| Houston, TX 77063 | Houston, Texas 77063 |
| 713-266-3311 | 713-266-3311 |
| 713-953-7513 (Fax) | 713-953-7513 (Fax) |

### Defendant-Appellee's Trial Counsel:

William P. Huttenbach
State Bar No. 24002330
Jessica B. Levy
State Bar No. 24064412
Hirsch & Westheimer, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002
713-220-9184
Fax: 713-223-9319

### Defendant-Appellee's Appellate Counsel:

| | |
|---|---|
| Michael D. Conner | William P. Huttenbach |
| State Bar No. 04688650 | State Bar No. 24002330 |
| Hirsch & Westheimer, P.C. | Hirsch & Westheimer, P.C. |
| 1415 Louisiana, 36th Floor | 1415 Louisiana, 36th Floor |
| Houston, Texas 77002 | Houston, Texas 77002 |
| 713-220-9184 | 713-220-9162 |
| Fax: 713-223-9319 | Fax: 713-223-9319 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .......................................................i

TABLE OF CONTENTS ...................................................................ii

INDEX OF AUTHORITIES…………………………………...……………….iii

STATEMENT OF THIS CASE…………………………………………………..iv

ISSUES PRESENTED…………………………………………………………….v

STATEMENT REGARDING ORAL ARGUMENT .................................................vi

TERMS AND ABBREVIATIONS USED WITHIN APPELLANT'S BRIEF…...1

STATEMENT OF FACTS…………………………………………………...2

SUMMARY OF ARGUMENT…………………………………………………...4

ARGUMENT…………………………………………………………………...6

PRAYER…………………………………………………………………….37

# INDEX OF AUTHORITIES

**Case Law**

**Statutes**

**Rules**

## STATEMENT OF THE CASE

Appellant Francisco Calleja-Ahedo filed suit in the 55th District Court of Harris County, Texas, against Compass Bank to recover for amounts improperly paid from his account at the Bank, including a forged check in the amount of $38,700. The Bank filed an Answer raising the affirmative defense under Tex. Bus. & Comm. Code §4.406, and counterclaimed for attorney's fees. Both sides filed Motions for Summary Judgment. The trial court granted the Bank's Motion and denied Calleja's Motion. Calleja is appealing both the trial court's granting the Bank's Motion and failing to grant Calleja's Motion.

# ISSUES PRESENTED

1.      The trial court erred in granting the Bank's Motion for Summary Judgment because the Bank failed to properly prove the deposit account agreement relied on by the Bank.


2.      The trial court erred in granting the Bank's Motion for Summary Judgment because the Bank failed to comply with its own deposit account agreement.


3.      The trial court erred in granting the Bank's Motion for Summary Judgment because the Bank failed to produce competent summary judgment evidence that it sent and/or made available relevant account statements to its customer.


4.      The trial court erred in granting the Bank's Motion for Summary Judgment because there is evidence that the Bank failed to act in good faith in connection with the subject transactions.


5.      The trial court erred in awarding attorney's fees to the Bank.


6.      The trial court erred in granting the Bank's Motion for Summary Judgment because there is no evidence that Calleja violated Tex. Bus. & Comm. Code §§3.405 and/or 3.406.


7.      The trial court erred in granting the Bank's Motion for Summary Judgment because the Bank's "no evidence" Motion was improper and premature.


8.      The trial court erred in failing to grant Calleja's Motion for Summary Judgment because Calleja proved that unauthorized payments were made from his account, and the Bank failed to prove its affirmative defenses.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Calleja believes oral argument would be helpful to the Court because of the number and complexity of the legal issues involved, and the few Texas cases dealing directly with the term "makes available" as used in Tex. Bus. & Comm. Code §4.406, and as omitted and/or defined in deposit account agreements.

**TERMS AND ABBREVIATIONS USED WITHIN APPELLANT'S BRIEF**

"Account" means the money market account no. 0200803759 at the Bank.

"Account Statements" or "Statements" means the monthly account statements for money market account no. 0200803759 at the Bank.

"Bank" means Defendant/Appellee Compass Bank.

"Calleja" means Plaintiff/Appellant Francisco Calleja-Ahedo.

"2008 Agreement" means the Deposit Account Agreement dated in 2008, which Calleja proved and claims that it governs the relationship between Calleja and the Bank concerning the Account during the relevant time periods.

"2012 Agreement" means the Deposit Account Agreement dated in 2012, which the Bank contends governs the relationship between Calleja and the Bank concerning the Account.

## STATEMENT OF FACTS

Calleja had a money market account for many years with the Bank upon which he wrote a few checks. He directed the Bank to mail his Account statements to his brother's address in the Woodlands because Calleja lived in Mexico City, and it was more convenient and secure to obtain the Account Statements when he visited his brother. The brother lived alone and no one else had access to the Statements until Calleja retrieved the Statements, unopened, at the Woodlands address. Calleja retained the Statements and his checks in a locked drawer in Mexico City, and none of them are missing. Calleja never requested internet access to the Account and never had a debit card for the Account. CR 46-48; 317-23; 438-39.

Calleja and the Bank both agree that their deposit relationship is governed by a deposit account agreement (CR 183-93; 436), but they differ on which agreement controls the transactions in this case. Calleja admits that he received the 2008 Agreement attached to his summary judgment affidavit. CR 46; 438. The Bank relies upon a 2012 Agreement attached to its motion for summary judgment (CR205-28), but there is no evidence that the 2012 Agreement ever became effective as between Calleja and the Bank.

Beginning in July 2012, the Bank began mailing the Account Statements to a series of addresses unknown to Calleja, who did not notice that Account Statements were not being received at the Woodlands address. CR 47; 439. On July 30, 2012, the Bank cashed check #1021, in the amount of $38,700, which was a forgery. CR 47; 71; 81. The check itself was fraudulent since Calleja's checks ended before check #1021, and the address imprinted on the check was unknown to Calleja, as was the payee of the check. Calleja received no benefit from the check. CR 47; 439.

Calleja discovered a problem with the Account on January 24, 2014, when an acquaintance reported to Calleja that a check written on the Account had been returned as "account closed." CR 439. On January 29, 2014, Calleja came to the Woodlands office of the Bank and completed a forgery affidavit for the Bank concerning check no. 1021. CR 439-40, 465. In late February, 2014, Calleja received a letter from Bank officer Jimmy Myers, stating that the Bank was not responsible for any loss. CR 440, 467. In the letter, Mr. Myers quotes from the language in the 2008 Agreement, describing it as "our Deposit Account Agreement," and which states that the customer agrees to report exceptions in

account statements "promptly after you receive the statement." The 2008 Agreement also contains the contradictory statement that it will not be liable for any loss concerning an exception unless it is reported to the Bank "within thirty (30) days after we send the statement to you." CR 457, 467. There is no requirement in the 2008 Agreement that Calleja had a duty to report unauthorized charges in Account Statements which the Bank merely "made available," nor is there any provision which permits the Bank to recover attorney's fees in this case. CR 443-62.

In June 2014, Calleja received for the first time copies of Account Statements after June 2012, which showed additional unauthorized charges of $1,621.23 and improper Bank fees of $123.82. These charges were reported to the Bank within 30 days after Calleja received the Account Statements showing these charges. CR 440-41, 470-525.

# SUMMARY OF THE ARGUMENT

This case concerns the Bank's negligence and its failure to follow its own Deposit Account Agreement. The Bank allowed a wrongdoer to change the address where the Bank was mailing Account Statements. The Bank then paid a fraudulent check from Calleja's account, with the wrongdoer purporting to sign Calleja's name using a signature that is completely different from Calleja's true signature on the Bank's signature card. The Bank's affirmative defense is that Calleja did not timely report the forgery to the Bank.

The Bank admits that a wrongdoer may have forged the check and may also have caused the Bank to mail the Account Statements showing the forgery to addresses unknown to Calleja. The Bank seeks to avoid its own negligence by asserting that "common sense" imposes a duty on Calleja to contact the Bank when he does not receive the Account Statements, even if the Bank sent the Statements to unauthorized and unknown addresses. The Bank further asserts that it "made available" the relevant Account Statements to Calleja by holding copies of them at the Bank. If the Bank can satisfy its "make available" duty by holding the Account Statements at the Bank (absent instructions to do so), then no bank would ever fail to comply with §4.406 since all banks retain bank statements. The term "makes available" in Tex. Bus. & Comm. Code §4.406 must mean more than merely holding bank statements.

Section §4.406 requires a bank customer to timely report unauthorized charges appearing in bank statements, but this duty arises only if the bank first "sends or makes available" the account statements to the customer. Texas Bus & Comm. Code §4.103(a) permits a bank and its customer to modify by agreement the duties imposed by §4.406, which the parties did in this case. Calleja and the Bank dispute which Deposit Account Agreement governs the transactions in this case, but the Bank loses under both Agreements.

As shown below, Calleja did not receive, and the Bank neither "sent" nor "made available," relevant Account Statements, as provided by the Deposit Account Agreements themselves and by cases construing §4.406. The 2012 Agreement relied on by the Bank specifically provides that account statements are made available "by holding all or any of these items for you or delivering all or any of these items to you, **in accordance with your request or instruction**." (emphasis added). There is no evidence that any account holder requested or instructed the Bank to hold Account Statements or to deliver them to unauthorized

4

addresses. Significantly, the Bank never discussed in the trial court these terms from its 2012 Agreement as they pertain to the requirements for "send" and "make available."

Furthermore, the Bank itself argues that §4.406 displaces all common law negligence claims, which would include the argument that Calleja was negligent in failing to report his failure to receive Account Statements. Section 4.406 does not place any duty on the customer to report unauthorized transactions until the bank sends or makes available account statements to the Customer, which the Bank failed to do in this case.

The Bank also made arguments in the trial court that Calleja was barred by Tex. Bus. & Comm. Code §§3.405 and/or 3.406. However, the Bank had the burden of proving all elements of these sections which the Bank failed to do.

The Bank and Calleja agreed to allow the trial court to determine whether claimed attorney's fees were reasonable and necessary. Calleja reserved the right to challenge such fees on appeal, including whether such fees are recoverable. The Bank is not entitled to recover fees under the 2008 Agreement, and the Bank failed to follow Supreme Court rules on proving attorney fees and otherwise had fatal flaws in its affidavits purporting to prove attorney's fees.

Calleja is entitled to summary judgment by proving that unauthorized charges were paid from his Account, which constitutes a breach by the Bank under both the 2008 and 2012 Agreements, and establishes the Bank's liability since the Bank failed to provide adequate proof for each element of its affirmative defenses.

5

## BANK DID NOT COMPLY WITH ITS OWN AGREEMENT

Texas Bus. & Comm. Code §4.406 sets forth duties for both a bank and its customer in relation to account statements. The bank must first "send or make available" the statements to the customer, which then triggers the customer's duty to detect and report unauthorized transactions. *See, e.g. American Airlines Employees Federal Credit Union v. Martin*, 29 S.W.3d 86, 92, 94 (Tex. 2000). The Bank's reliance on §4.406 is an affirmative defense, as to which the Bank "bears the burden of proving each essential element of that defense." *FDIC v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012).

Section 4.103(a) permits parties to vary the effect of Article 4's provisions by agreement, so long as that agreement does not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or limit the measure of damages. *See, e.g., American Airlines Employees Federal Credit Union v. Martin,* 29 S.W.3d 86, 95 (Tex. 2000). Both parties agree that a deposit account agreement governs the deposit relationship between Calleja and the Bank. CR 183-93; 436. *See* Tex. Fin. Code §34.301. However, the parties dispute which Account Agreement applies to the 2012 transactions at issue.

Calleja proved the 2008 Agreement attached to his Affidavit by admitting that he received the 2008 Agreement. CR 46, 51-70. The Bank also originally produced the 2008 Agreement in discovery. *See* bate stamp marks CB000281

6

through CB000300 at bottom of each page of the 2008 Agreement. Furthermore, the letter to Calleja dated February 7, 2014, from Jimmy Myers, a vice president of the Bank, (CR 48; 75), quotes verbation from the 2008 Agreement, as being applicable to the deposit relationship between Calleja and the Bank. The quoted wording differs from the 2012 Agreement attached to the Bank's Motion for Summary Judgment.[1]

The Bank does not dispute that the 2008 Agreement was effective between 2008 and 2012, but apparently contends that the 2012 Agreement amended and took the place of the 2008 Agreement. A deposit account agreement must be amended by mailing the amendment to the account holder, or as otherwise agreed to by the parties. *See* Tex. Fin. Code §34.302, copy of which is attached hereto at Appendix 1.

Section 17 of the 2008 Account Agreement provides that it may be amended by the Bank "upon giving prior notice to you," which may be accomplished by:

> Mailing you notice of the amendment to the last address shown on our records, by making the notice available with the periodic statement of your account (as applicable) or by posting notice of the amendment in our offices. (CR 299 at bottom left, continuing at CR 298 at upper right).

> There is no evidence that the Bank did any of these things, or if it did, when the Bank did them. Instead, the Bank attempts to prove the 2012 Agreement by

---

[1] The Bank also produced a 2013 Agreement (CR 136), but neither party relies upon it in their respective Motions for Summary Judgment.

attaching the Affidavit of Kathy Mueller at Exhibit A to its Motion. CR 202-03.

Mueller testifies at paragraph 3 of her Affidavit that "[t]he account was governed by the account agreement governing such account. See Tab 1," and at paragraph 5, that "[a]ttached as Tab 1 is a copy of the written contract governing the deposit relationship between Plaintiff and Compass Bank," and at paragraph 8 that "the account agreement evidences the agreement in effect between the Plaintiff and Compass Bank." These statements are without foundation, are conclusory, and must be disregarded.[2]

The conclusory statements made by Mueller are further demonstrated by her second affidavit, in which she states repeatedly that she merely "believes" or that it "appears" that the 2012 Agreement attached to her first affidavit is the one governing the deposit relationship between Calleja and the Bank. CR 396. Obviously, Mueller's mere belief in the 2012 Agreement is speculation and insufficient to show that it became effective as a contract between Calleja and the Bank.

The 2012 Agreement is further shown to be inapplicable to Calleja by the Agreement itself, which states that it is "Revision February 2012 - **Al Nova Branches Only**" (emphasis added). CR 228. The Bank fails to provide any

---

[2] Calleja attempted to have these conclusory statements stricken by the trial court without success. CR531-34. However, this Court may disregard conclusory statements even without a ruling from the trial court. *See, e.g., Seaprints, Inc. v. Cadleway Props,* 446 S.W.3d 434, 441 (Tex. App. — Houston [1st Dist.] 2014, *no pet.*).

evidence explaining this limitation or that Calleja was ever connected to any "Al Nova Branches." Finally, the uncertainty expressed by Mueller in her second affidavit is in itself sufficient to create a fact issue concerning whether the 2012 Agreement applies to Calleja. Even the Bank itself admits that the 2012 Agreement is only "believed to be the deposit agreement in effect during the relevant time period." CR 168, at fn 1.

Mueller also attempts to prove the 2012 Agreement by asserting that it is a business record. CR 203. However, proving that the 2012 Agreement is a business record does not automatically make it effective against Calleja. The Bank must take the further step of proving that the 2012 Agreement became effective as to Calleja, which requires showing that the Bank provided notice of the 2012 Agreement to Calleja or to one of the other account holders as required by Tex. Fin. Code §34.302 and/or by the 2008 Agreement, and if so, when this was done. *See, e.g.,* Tex. Rule Evid. 803(6), which provides that business records are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *See also, Martin, supra,* 295 S.W.3d at 89 (Tex. 2000), wherein the Supreme Court stated that "[a]lthough the Credit Union did not mail out copies of the Deposit Agreement to all of its members, it notified them that copies could be picked up at any of its branches, and that they could call the Credit Union to request a copy." There is no evidence that the Bank

sent the 2012 Agreement to Calleja or that the Bank notified Calleja in any manner that the 2012 Agreement was available for pick up. Such proof is completely lacking from the Bank's Motion, which means that the 2012 Agreement must be disregarded, and only the 2008 Agreement determines the deposit relationship between Calleja and the Bank.

Despite the parties' dispute over which Deposit Account Agreement applies, the Bank loses under both Agreements. The copy of the 2008 Agreement duplicated in the Clerk's Record is barely legible, which makes it difficult to read. A better copy is attached hereto at Appendix 2.[3] The relevant section from the 2008 Agreement (CR 51) provides that Calleja has a duty to report exceptions "promptly after you **receive** the statement." (emphasis added). Later in the same section, the 2008 Agreement provides that Calleja should report exceptions "within thirty (30) days after we **send** the statement or notice to you." (emphasis added). CR 295.

These conflicting statements create an ambiguity which is discussed below. The term "send" is not defined in the 2008 Agreement, but Tex. Bus. & Comm. Code §1.201(b)(36) requires that a document be "properly addressed" in order to be "sent." The Account Statements in this case were, beginning with July 2012

---

[3] Another problem with the 2008 Agreement in the Clerk's Record relates to pagination. Two pages of the 2008 Agreement are contained on each page of the Clerk's Record, but the pages of the 2008 Agreement are not sequential. The copy attached at Appendix 2 has sequential pages.

Statement, not properly addressed because there is no evidence presented by the Bank that the addresses (other than the Woodlands address to which prior Statements were sent) were ever authorized by any signatory of the Account. In fact, the evidence shows that the Bank allowed the addresses to be changed by an unknown and unauthorized person. CR 48. The 2008 Agreement specifically provides that only "[a]ny account owner or authorized signer of a joint account may change the mailing address for your account." CR 295. The Bank frankly acknowledges that the Account Statements may not have been properly addressed (CR 374), and the trial court admits in its summary judgment order that it was not basing its ruling on whether the Account Statements were "sent," but instead was focusing on whether the statements were "made available." CR 735.

Despite the trial court's focus on whether the Bank "made available" the Account Statements, the 2008 Agreement only requires Calleja to review and report discrepancies in Account Statements which have been received by Calleja, or alternatively, sent by the Bank. The 2008 Agreement simply does not require Calleja to review Account Statements which have been "made available." The exact wording from the 2008 Agreement could not be plainer:

> You agree that you will carefully examine each account statement or notice you **receive** and report any exceptions to us promptly after you **receive** the statement and report any exceptions to us. If you do not report an exception to us within thirty (30) days after we **send** the statement or notice to you,

you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we **send** the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any authorized, forged, or altered item, or paying any other altered item altered or forged by the same wrongdoer if we paid the other item before we received of any of these exceptions from you. (emphasis added). CR 295.

As shown on the preceding page, the term "send" requires that the document be "properly addressed," and the 2008 Agreement provides only that "[a]ny account owner or authorized signer of a joint account may change the mailing address for your account" CR 295. The Bank produced no evidence that the Account Statements mailed after June 2012 were properly addressed, and in fact, the evidence shows that the Account Statements were mailed to unauthorized addresses. CR 481.

Although §4.406 provides a defense if the Bank "sends or makes available" the Account Statements, the Bank is bound by its own modifications of §4.406, as provided in the 2008 Agreement. The 2008 Agreement requires Calleja to review and report exceptions only when Account Statements are "received" by Calleja, or alternatively, "sent" by the Bank. This case is virtually identical to the recent case of *Compass Bank v. Nacim*, 459 S.W.3d 95 (Tex. App. - El Paso, 2015, *no pet.*), which dealt with identical language in another Compass Bank account agreement. A copy of this case is attached at Appendix 3. The El Paso court held that the

12

account agreement was ambiguous as to whether it required that the statements be "received" or "sent" before the bank customer had a duty to report discrepancies in the statements. *Nacim, supra* at 107-08. Any ambiguity must be construed against the Bank and in favor of Calleja. *See, e.g., JMB Partners, Ltd. v. Osloub*, 4 S.W.3d 368,371 (Tex. App. − Houston [1st Dist.] 1999, *no pet*.

In any event, the ambiguity is irrelevant in this case since the evidence shows that the Account Statements were neither received by Calleja nor properly sent by the Bank, and the Bank provided no evidence to the contrary. CR 46-47. Significantly, the El Paso court also held that the additional "made available" language in §4.406 was inapplicable because Compass Bank had altered the §4.406 duties in its account agreement to delete that option. *Nacim, supra* at 108. The Bank is bound by the same wording in the 2008 Agreement, which eliminates the Bank's option of making the Account Statements available to Calleja. *See* Tex. Fin. Code §§34.301; 341.302; *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 563-64 (Tex. 1984).

Assuming arguendo that the 2012 Agreement applies, the Bank also loses under that Agreement, even though it was never shown to be effective between the Bank and Calleja. Similar to the 2008 Agreement, the 2012 Agreement provides that "you will carefully review each account statement or notice you **receive** and report any exceptions to us promptly after you **receive** the statement or notice."

(emphasis added). Unlike the 2008 Agreement, the 2012 Agreement then follows with language requiring that the account holder report exceptions within thirty days after we send or "make the statement or notice available to you." CR 212. As shown by the *Nacim* case, these different provisions create an ambiguity as to whether the obligation to review statements and report exceptions arises only when the statements are received or when they are sent or when they are made available. This ambiguity creates uncertainty as to when the thirty day time period begins to run. *Nacim, supra* at 107-09.

The uncertainty is compounded by the Bank's argument that it made Account Statements "available" by holding them at the Bank. Does this mean that the thirty day period begins when the Statements are first created, or when they are sent, or when they are received? *See Nacim, supra* at 108. Adopting the Bank's argument that it made Statements "available" by holding them at the Bank (absent a request to do so by the account holder) [4] would render meaningless the duty of banks under §4.406 since every bank retains bank statements. *See, e.g., First Citizens Bank v. All Lift of Georgia, Inc.* 251 Ga. App. 484, 555 S.E.2d 1 (2001), and other cases discussed *infra.* The Texas Supreme Court cited the *All Lift* case

---

[4] The Bank possibly could have avoided this lawsuit by defining "make available" in its Deposit Account Agreement to include holding Statements at the Bank and/or posting them online, but the Bank chose not to do so. Instead the Bank's 2012 Agreement provides that retaining statements at the Bank makes them "available" only when requested or instructed by the account holder. CR 212.

when it was making a distinction between deceased and living depositors. *Jefferson State Bank v. Lenk*, 323 S.W.3d 146, 150 at fn 7.

Even if the thirty day period runs from when account statements are "made available" to the customer, this does not help the Bank because the 2012 Agreement defines availability in the Section entitled "Mailing and Availability." This Section (CR 212) provides as follows:

> We may make statements, cancelled checks (if applicable to your account), notices or other communications available to you by holding all or any of these items for you, or delivering all or any of these items to you, **in accordance with your request or instructions.**" (emphasis added).

The Bank never produced any evidence that it received a request or instructions from any account holder to hold the Account Statements or to deliver the Statements in any manner other than mailing the Statements to the Woodlands address. To the contrary, the evidence shows that no such request or instructions had been given to the Bank. CR 48.

Calleja highlighted this provision in his Motion and again in his Response to the Bank's Motion (CR36; 428), but the Bank failed to even address the quoted wording, which specifies what constitutes "make available." Instead, the Bank simply recited various ways that the Bank could have made the Account

Statements available to Calleja, none of which are included within the term "makes available" as defined in the 2012 Agreement. CR 374-76.

The Bank emphasizes that Calleja failed to report the forged check for almost a year and a half after the Bank paid the forged check. The Bank intimates that Calleja is barred by the one year deadline set forth in §4.406(f), but this section provides that the one year period does not commence until "after the statement or items are made available to the customer." *See, e.g., Jefferson State Bank v.* Lenk, 323 S.W.3d 146, 150 (Tex. 2010). As shown above, the Bank failed to make the Account Statements "available" to Calleja until 2014.

## THE BANK DID NOT PROVE THAT IT SUFFERED A LOSS

Tex. Bus. & Comm. Code §4.406(d)(1) provides that if the customer failed to timely report his unauthorized signature on a check after the bank sends or makes available account statements which provide sufficient information of the problem the customer is precluded from asserting the unauthorized signature against the Bank, but only "if the bank also proves that it suffered a loss by reason of the [customer's] failure." There is absolutely no evidence that the Bank suffered a loss, especially since the forged check was already paid by the Bank before the Bank asserts that Calleja should have reported that he had not received his missing Account Statement. CR 47; 71; 81. *See, e.g., Nacim, supra* at 106-07.

16

**COURT CASES ARE FAVORABLE TO CALLEJA**

The Bank relies heavily on the Texas Supreme Court case of *American Airlines Employees Federal Credit Union v. Martin*, 29 S.W. 3d 86, 94 (Tex. 2000), in which the Supreme Court stated that the customer's duty to detect and report unauthorized transactions "is triggered when the bank meets its burden to provide the customer with enough information that the customer can detect that the unauthorized transaction has occurred." The Court further stated, and the Bank emphasizes, that the customer's burden "includes the risk of non-receipt of account statements." However, this quote must be read in context with footnote 37 immediately following the quote, which states that "when account statements are **mailed to the proper address**, the risk of non-receipt falls on the account holder." (emphasis added). The Court further cited to the case of *Stowell v. Cloquet Co-Op Credit Union,* 557 N.W.2d 567, 571-72 (Minn. 1997), which also emphasized that account statements must be properly addressed. Even the Bank quotes from the *Stowell* case that "once account statements are mailed ***to the accountholder's address,*** the risk of non-receipt falls on the account holder." (emphasis added). CR 175. *See also,* Tex. Bus. & Comm. Code §1.201 which defines the term "send" to require that the item be "properly addressed."

Significantly, in both the *Martin* and *Stowell* cases there is no question that the bank statements were mailed to the proper address of the account holder. The

17

risk of non-receipt was proper in those cases. In this case, the evidence shows that the relevant Account Statements were not sent to an authorized address. CR 48.

The Supreme Court next spoke on this issue in *Jefferson State Bank v. Lenk,* 323 S.W.3d 146, 149 (Tex. 2010), which specifically involved a bank sending account statements to an imposter. The Court stated:

> We reject the Bank's argument that it satisfied its burden by sending statements to Spillman [the imposter]. Even assuming, without holding, that the Bank could have relied on the fraudulent letters, that reliance would not have made Spillman the Bank's customer. Thus sending Spillman the statements could not fulfill the Bank's obligation to provide account statements "to a customer."

The Court went on to hold that in the special circumstance when a bank is aware of a customer's death, the bank can comply with §4.406 only by retaining statements at the bank for inspection by a properly appointed estate representative, and the time limit for discovering problems does not commence until the estate representative is appointed.

The Bank seeks to distinguish this case based on its special rule for deceased account holders, but if the Court wanted to hold generally that a bank's retention of statements for access by the customer satisfies the "make available" standard, it could easily have done so. Instead, the Supreme Court differentiated between deceased and living customers in its footnote 7, which cited *First Citizens Bank v. All-Lift of Georgia, Inc.,* 251 Ga. App. 484, 555 S.E.2d 1 (2001). In *First Citizens,*

the Georgia court held that banks cannot satisfy the section 4.406 burden by merely retaining the statements at the bank (absent the customer's request to do so). The Texas Supreme Court stated that its holding in *Jefferson* "does not conflict with" *First Citizens* because the Georgia court was not dealing with how a bank could comply with §4.406 for a deceased customer.

The *First Citizens* case makes perfect sense since allowing a bank to "make available" bank statements by merely retaining them at the bank would completely emasculate the duties imposed on banks under §4.406. Since all banks retain copies of bank statements in some form, there would never be a bank which could fail in its duties under §4.406. This result is unreasonable and cannot be intended by the statute. The term "makes available" must mean more than mere retention of bank statements.

Finally, in *FDIC v. Lenk*, 361 S.W.3d 602, 607-08 (Tex. 2012), the Supreme Court reasserted its holding in *Jefferson*, that a bank does not fulfill its §4.406 obligation to provide account statements "to a customer" by sending them to an imposter. The Supreme Court further cited and relied upon Tex. Fin. Code §34.302(b), which specifically provides that a bank must provide statements "to the account holder."

Furthermore, neither the *Lenk* nor the *First Citizens* cases dealt with an account agreement which specifies what constitutes "make available." In this case, the Bank suggests that it "made available" the relevant Account Statements by holding copies at the Bank and/or by allowing optional internet access to accounts, which Calleja did not request. CR 374-76. Significantly, the 2012 Agreement relied on by the Bank, defines "make available" in a manner which excludes each of the ways which the Bank suggests that it made Account Statements available. CR 212.

Cases from other jurisdictions which have construed §4.406 agree that the term "makes available" requires more than a bank simply retaining the statements at the bank. In *Matin v. Chase Manhattan Bank,* 791 N.Y.S.2d 158, 159-60 (N.Y.S.Ct. 2004), a plaintiff argued that his statements were not mailed to his home or to a person directed by him after the bank sent his statements to an address based on a forged change of address card. The New York Supreme Court reversed an order granting the bank's motion for summary judgment after finding that the plaintiff's allegations were sufficient to raise a question of fact as to whether the bank statements were "made available" to the plaintiff. The *Matin* court stated:

> "When a customer requests that a bank mail the statements either to himself or to another person, and the bank complies, the statements are considered "made available to the customer" for the purpose of the

20

UCC (*Mesnick v. Hempstead Bank,* 106 Misc. 2d 624, 626, 434 N.Y.S.2d 579; *Jensen v. Essexbank,* 396 Mass. 65, 483 N.E.2d 247; *Terry v. Puget Sound Natl. Bank*, 80 Wash. 2d 157, 492, P.2d 534; *Brown v. Cash Mgt. Trust of Am.,* 963 F.Supp. 504 [D.Md. 1997]. However, the plaintiff alleged that the statements were not mailed to him or to a person to whom he directed because the bank sent the statements to the address on a forged change of address card. The bank did not contest that the statements were sent to the address on the forged change of address card rather than his actual address. These allegations were sufficient to raise a question of fact as to whether the statements were made available to the plaintiff under UCCC 4-406(1) (see Woods v. MONY Legacy Life Ins. Co., supra at 286, 617 N.Y.S.2d 452, 641 N.E.2d 1070)."

Another applicable case is *Robinson Motor Xpress, Inc. v. HSBC Bank, USA,* 826 N.Y.S.2d 350 (N.Y.S.Ct. 2006), in which the New York Supreme Court held that the bank statements were not "made available" to the plaintiff within the meaning of §4.406 when they were mailed to an address other than that which the plaintiff had designated. The *Robinson* court explained that when:

"the customer has expressly directed that the statements be mailed to a specific address or officer...and the bank fails to comply with that instruction, such delivery is equivalent to the statements having been improperly directed to an address unrelated to the plaintiff, and the statements cannot be said to have been "made available" to the plaintiff by such mailing."

*See also, First Citizens Bank v. All-Lift of Georgia, Inc.* 251 Ga. App. 484, 555 S.E.2d 1 (2001), cited by the Texas Supreme Court as noted above, which held that a bank cannot satisfy its initial burden under §4.406 by retaining statements at the bank, absent the customer's authorization to do so, and *Merna v. Simuro*, 904

21

N.Y.S.2d 197 (N.Y.S.Ct. 2010), which denied a bank's summary judgment when the evidence did not show that the account holder had authorized the mailing of account statements to the address on record with the bank.

Each case relied upon by the Bank involves statements sent to a proper address or to a person authorized to receive statements. One case upon which the Bank relies is *Stowell v. Cloquett Co-Op Credit Union*, 557 N.W.2d 567 (Minn. 1997), cited by the Texas Supreme Court as noted above. The *Stowell* case involved a credit union which was mailing account statements to the correct address, but the account holder was not receiving the statements because the statements were being removed from the account holder's mailbox by a neighbor who was forging checks on the account. The court stated "the modern UCC case law of other jurisdictions is virtually unanimous in holding that, ***once account statements are mailed to the account holder's address,*** the risk of non-receipt falls on the account holder..." (emphasis added). 557 N.W.2d at 571. This case directly supports Calleja's position that the Bank has the initial burden to mail account statements to the authorized proper address for the Account and not to the unauthorized address of an imposter. Only when the Bank fulfills its initial duty, does Calleja have a duty to inspect and report discrepancies.

The Bank also relies on *In re Estate of Berry,* 280 S.W.3d 478 (Tex. App. — Corpus Christi 1993, *no writ*); *Borowski v. Firstar Bank Milwaukee,* 579 N.W.2d

22

247 (Wis. App. 1998); *Tumlinson v. First Victoria National Bank*, 865 S.W.2d 176 (Tex. App. ― Corpus Christi 1994, *no writ*); *Hatcher Cleaning Co. v. Comerica Bank ― Texas*, 995 S.W.2d 933 (Tex. App. ― Ft. Worth 1999, *no pet.*); *Watseka First National Bank v. Horney*, 686 N.E.2d 1175, 35 UCC Rep. Serv. 2d 582 (Ill. App. Ct. 1997); *Sabatino v. Atlantic Sav. Bank,* 444 S.E.2d 537 (S.C. App. 1994); *Mesnick v. Hempstead Bank*, 434 N.YS.2d 579 (N.Y. 1980); *Woods v. MONY Legacy Life Ins. Co.,* 617 N.Y.S.2d 452 (N.Y. 1994); *Siecinski v. First State Bank of East Detroit*, 26 UCC Rep. Serv. 2d 666, 669-70 (Mich. App. Ct. 1995); *Gerber v. City Nat'l Bank of Florida*, 619 So.2d 328, 329 (Fla. Dist. Ct. App. 1993) and *Minskoff v. American Express,* 98 F.3d 703 (2nd Cir. 1996), but each of these cases involved statements being mailed to an authorized address. The case of *Myrick v. National Savings & Trust Co.,* 268 A.2d 526 (D.C. 1970), involved forged checks which were cashed after the bank had notified the account holder that there was no money in the Account. The bank also submitted evidence that it mailed monthly statements to its customers, and there is no indication by the Court that the statements were mailed other than to an authorized address.

The case of *Wetherill v. Putnam Investments,* 122 F.3d 554 (8th Cir. 1997), involved a corporate secretary who was authorized to make deposits into a corporate account but not withdrawals. The secretary changed the address for the account to a post office box and proceeded to forge checks on the account. The

23

court held that §4.406 barred the Plaintiff's claim because the secretary was an officer of the company, the president of the company was aware of the post office box, some corporate mail was received there, and the monthly statements were also being sent to the authorized address of the company's broker.

The Bank cites only two cases for the proposition that holding account statements at the Bank constitutes making them available to the customer. In the early case of *Westport Bank & Trust v. Lodge*, 325 A.2d 222 (Conn. 1973), the account holder knew that account statements were being mailed to her personal secretary and knew that there were overdrafts and other irregularities concerning the account. The reference to account statements being available at the bank is merely a comment on one facet of the evidence and not the main basis for the court's decision. *Karmin Door Co. v. Bank Boston*, No. 99-0146 (Mass. Superior Ct. 2000) is an unreported case which simply does not hold that a bank may comply with its §4.406 duties by holding the statements at the bank. Instead, evidence showed that bank statements were sent to the customer's address and that an employee of the customer forged checks. The customer failed to timely notify the bank of the forgeries even though statements were being received at customer's address. Neither the *Lodge* nor the *Karmin* case supports the Bank's contention that merely holding bank statements (absent request by or notice to the customer)

satisfies the Bank's duties under §4.406. [5] All of the cases relied upon by the Bank simply do not support its compliance with §4.406 when the Bank sends Account Statements to an imposter at an unauthorized address, completely unknown and unrelated to the account holder.

## NO DUTY TO REQUEST BANK STATEMENTS

The Bank made a "common sense" argument in the trial court (without citing any authority), that if Calleja did not receive his Account Statements, he should have requested them from the Bank within a month after he failed to receive them. CR 373. The trial court apparently agreed, stating in its summary judgment order that "as a matter of law, Plaintiff has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements." CR 735.

This type of argument is completely misplaced. There is no requirement in §4.406 that a customer request missing bank statements which the bank sent to an unauthorized address. Section 4.406 only requires that a customer inspect and report discrepancies in bank statements which the bank has sent or otherwise made available to the customer. If the bank has not properly sent or made available a

---

[5] The Bank further argued in the trial court that the Account Statements notified Calleja that he could request statements from the Bank, thereby making them available. The wording referenced states: "If you have questions about your statement, call Customer Service at 1-800-266-7277." This wording clearly refers to questions about the statement in which the wording appears and which would have been received by the customer. It is not notice that the customer can contact the Bank to obtain missing statements.

bank statement, the customer has no duty under §4.406 to report any discrepancy in such bank statement, or to request missing bank statements.

This case is very similar to *Bank of American, N.A. v. Haag,* 37 S.W.3d 55, 58-59 (Tex. App. — San Antonio 2000, *no pet.*), in which the court held that a withdrawal by a person not on the signature card was "unauthorized." In response to the bank's argument that the account holder was estopped because he never notified the bank that the account statements were erroneously addressed, the court further held that the account holder had no duty to speak under these circumstances, either under common law principles or pursuant to §4.406.

Even the Bank agrees in this case that common law claims and defenses concerning an account holder's duty to report discrepancies in account statements have been completely displaced by §4.406. CR 171. Section 4.406 places no duty on the account holder to notify the bank concerning problems with his statements unless the bank first sends or makes available such statements to the account holder. *See* §4.406, Comment 1. As shown above, the Bank never sent or made available the relevant account statements to Calleja, but instead sent the statements to an unauthorized address. CR 48.

Finally, at the time the Bank contends that Calleja should have requested the missing Account Statements, the Bank had already paid the forged check. CR 71;

81. The Bank does not present any evidence or argument that the Bank suffered any loss because of Calleja's alleged negligence in failing to report missing Account Statements, which completely defeats the Bank's defenses under §4.406 and under any common law negligence claim. [6]

## TEX. BUS. & COMM CODE §3.406 IS INAPPLICABLE

The Bank argues that Tex. Bus. & Comm. Code §3.406 bars Calleja's claims. CR 195. Section 3.406 provides as follows:

> A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to making a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, *in good faith*, pays the instrument or takes it for value or for collection (emphasis added).

In order for §3.406 to apply, the Bank has the burden to prove that it paid the $38,700.00 check in "good faith." *See, e.g., Bank of Texas v. VR Elec, Inc.,* 276 S.W.3d 671, 678 (Tex. App. — Houston [1st Dist.] 2008, *pet. denied*). The term "good faith" means honesty in fact and "the observance of reasonable commercial standards of fair dealing." Tex. Bus. & Comm. Code §1.201(b)(20). The Bank has produced absolutely no evidence of its "honesty in fact" or of its "observance of reasonable commercial standards of fair dealing." The Bank simply is not entitled to the protections of §3.406.

---

[6] Tex. Bus. & Comm. Code §4.406(e) also provides a comparative negligence test if both the Bank and Calleja are negligent and the Bank proves that it suffered a loss.

In addition, the Bank speculates that Calleja's brother was involved in the forgery of the $38,700.00 check. CR 195. However, the Bank has provided absolutely no evidence in support of this allegation. The Bank further contends that permitting the brother to access Calleja's banking information allowed other parties to learn Calleja's banking information, which "likely" allowed Calleja's purported loss to occur. Calleja admits that monthly account statements were received at his brother's address in the Woodlands, but the uncontroverted evidence is that the Account Statements were never opened by the brother, were not available to anyone else before being delivered unopened to Calleja, and that all Account Statements and checks were accounted for prior to July 2012. CR 47-48. The Bank has produced no evidence that Calleja or his brother failed to exercise ordinary care in handling checks and/or Account Statements and further has produced no evidence that actions or failure to act by Calleja or his brother contributed to "the making of a forged signature" in the $38,700.00 check.

## TEX. BUS. & COMM. CODE §3.405 DOES NOT APPLY

The Bank further alleges that Calleja violated Tex. Bus. & Comm. Code §3.405. This statute provides that an employer is responsible for the fraudulent endorsement of a check by an employee or a person acting in concert with the employee if the employer entrusted the employee with the check, and the check was cashed in "good faith" by the bank. The Bank alleges that since Calleja

allowed Account Statements to be mailed to his brother's address in the Woodlands, this action somehow makes Calleja an "employer" and his brother an "employee", with Calleja being responsible for the fraudulent endorsement on the $37,800.00 forged check paid by the Bank on July 30, 2012.

Section 3.405 cannot possibly apply in this case for several reasons. First, the evidence is uncontradicted that Calleja's brother only received and delivered to Calleja unopened account statements. The brother had absolutely no responsibility with regard to checks for the Account. CR 47. The term "responsibility" is defined narrowly to include authority with respect to instruments [checks]:

> (a)(B)(3) "Responsibility" with respect to instruments means authority (i) to sign or endorse instruments on behalf of the employer, (ii) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (iii) to prepare or process instruments for issue in the name of the employer, (iv) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (v) to control the disposition of instruments to be issued in the name of the employer, or (vi) to act otherwise with respect to instruments in a responsible capacity. "Responsibility" does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.

Second, §3.406(b) further provides that the Bank must pay the check in "good faith." The term "good faith is defined at §1.201(b)(20) as not only honesty in fact but also "the observance of reasonable commercial standards of fair

dealing." The burden of proving "good faith" is on the Bank. *See, e.g. Bank of Texas v. VR Elec., Inc.,* 276 S.W.3d 671, 678 (Tex. App. — Houston [1st Dist.] 2008, *pet. denied*), construing §3.406, which has the same good faith standard as §3.405. The Bank has submitted no evidence that it paid the $37,800.00 check in good faith. On the other hand, there is evidence that Calleja's purported signature on the check is in no way similar to his signature on the Account signature card and is other checks. CR 71.

## THE BANK'S LACK OF GOOD FAITH

Tex. Bus. & Comm. Code §§1.201(20) and 1.304 require that the Bank exercise good faith performing all of its duties imposed by the UCC, including payment of checks and otherwise handling Calleja's account at the Bank. Section 1.304 applies to all duties required under the Texas Uniform Commercial Code, including Bank's duties under §4.406. *See also, La Sara Grain Company v. First Nat'l Bank,* 673 S.W.2d 558, 562 (Tex. 1984), in which the Supreme Court stated: "[if checks were not paid in good faith] the bank cannot claim the protection of section 4.406. The time limits of that section apply only to items paid in good faith." In 1984, the definition of "good faith" required only "honesty in fact." *See La Sara supra* at 563. In 2003, the definition of "good faith" was expanded in §1.201(20) to include not only honesty in fact but also observance of "reasonable commercial standards of fair dealing."

30

There is evidence in this case that the Bank was not honest in fact and/or did not following reasonable commercial standards of fair dealing. The signature on the forged check does not even resemble Mr. Calleja's signature on the signature card for the Account or on other documents admittedly signed by Calleja. CR 71, 73, 230, 317-23. This shows that the Bank did not even attempt to compare the signature on the check with the signature card for the account. In *McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183, 188-91 (Tex. App. — Dallas 1989, *no writ*), the court held that a bank's practice of not comparing the signature on checks with the signature card does not comply with reasonable commercial standards and was unfair.

Furthermore, there is evidence that the Bank allowed an imposter to change the address to which Account Statements were to be mailed, and there is no evidence that the Bank made any attempt to send a notice to the Woodlands address that there had been a change of address. CR 46-49, 317-23. Both of these indicate the Bank's failure to comply with reasonable commercial standards of fair dealing.

The Bank has the burden of proving its good faith under Tex. Bus. & Comm. Code §§3.405 and 3.406, which were raised as defenses in the Bank's Motion for Summary Judgment. *See, e.g. Bank of Texas v. VR Electric Inc.,* 276 S.W.3d 671, 678-80 (Tex. App. — Houston [1st Dist.] 2008, *pet. denied*). The Bank produced

no evidence of its procedures or its good faith. Even if Calleja had the burden to prove the Bank's failure to exercise good faith under §4.406, Calleja plead that the Bank failed to act in good faith (CR 420-22), and submitted evidence that the Bank failed to exercise good faith. CR 46-49; 317-23.

## BANK IS NOT ENTITLED TO RECOVER ATTORNEY'S FEES

The parties in this case agreed that the trial court could determine, as a finder of fact, whether the Bank's claimed attorney's fees were reasonable and necessary. However, Calleja retained the right to challenge whether the Bank's attorney's fees were recoverable, and/or whether the Bank had properly proven its requested fees. CR 714.

As shown above, the 2008 Agreement is the only one applicable in this case. The 2008 Agreement does not allow the Bank to recover attorney's fees against Calleja under the circumstances of this case. The only section for recovery of attorney's fees in the 2008 Agreement (Section 19 on page 35) provides that "[i]f you fail to pay any amounts due under this Agreement and your debt is referred to an attorney(s), not one of salaried employees...you agree to pay all reasonable expenses permitted by applicable law, including but not limited to, court costs and attorney's fees set by the court." CR 54. The Bank cannot recover attorney's fees under this section because the Bank did not seek, and did not recover, any debt

owed by Calleja under the 2008 Agreement. The Bank also did not seek a declaratory judgment (CR 6-12), and cannot recover attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §38.001(8) because the Bank did not seek or recover damages from Calleja. *See, e.g., Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

The Bank also did not properly prove its attorney's fees awarded by the trial court. The affidavits submitted by Mr. Huttenbach are insufficient to support the attorney's fees awarded by the trial court. Mr. Huttenbach filed three affidavits seeking to justify the $49,186.65 of attorney's fees through summary judgment awarded by the trial court. CR 571-72; 604-06; 716-17. Mr. Huttenbach's first affidavit (CR 571-72) states that the Bank is entitled to recover $28,840.19 of fees and costs, but the attached fee statements only total $22,722.69. CR 574-602. Mr. Huttenbach never explains this discrepancy. Mr. Huttenbach's second affidavit (CR 604) does not claim additional attorney's fees but only purports to expand on why the attorney's fees are proper. Mr. Huttenbach still did not explain the discrepancy in the first affidavit concerning the amount of attorney's fees.

Mr. Huttenbach states in all of his affidavits that his usual hourly rate is $345.00 but that the Bank receives a discount. The fee statements attached to Mr. Huttenbach's first affidavit reflect a discounted charge of $315.00 per hour (CR 334-61), but the fee statements attached to Mr. Huttenbach's third affidavit (CR

33

718) calculates his hourly rate at $345.00, which is in excess of the discount that he claims the Bank is charged. Mr. Huttenbach did not explain this discrepancy. Furthermore, the Bank bills attached to all of Mr. Huttenbach's affidavit still do not add up to the $49,186.65 awarded by the trial court. CR 571-602; 608-19; 718-23. Mr. Huttenbach's affidavits are conclusory and do not support the requested fees. *See, e.g., Vega v. Compass Bank*, No. 04-13-00383-CV, at 5-6 (Tex. App. ― San Antonio, March 12, 2014, *no pet.*) (Memo. Opin.), which dealt with Mr. Huttenbach's affidavit in another Compass Bank case.

Finally, Mr. Huttenbach does not comply with the requirements set forth by the Texas Supreme Court in *Long v. Griffin*, No. 11-1021, ___ S.W.3d ___, 2015 WL 1643271, at *3 (Tex., April 25, 2014); *City of Laredo v. Montano,* 414 S.W.3d 731, 736 (Tex. 2013). First, a substantial number of the entries in the fee statements attached to Mr. Huttenbach's affidavits are completely or substantially blocked out (CR 334-61; 571-602; 608-1; 718-23), presumably because Mr. Huttenbach considered that they contained attorney-client privilege. However, without disclosing even a description of the work being performed, Calleja's attorney is unable to respond whether those portions of the fee statements show reasonable and/or necessary fees for the undescribed work. Second, Mr. Huttenbach does not provide information concerning the identity and experience of the other attorneys and paralegals working on the case and whose time is billed in

the fee statements. Again, Calleja's attorney is unable to properly evaluate whether such work and fees charged by these other persons were reasonable and/or necessary.

Therefore, there is no evidence and/or insufficient evidence to sustain the $49,186.65 awarded by the trial court through summary judgment, especially since no depositions were taken, and the amount awarded to the Bank was substantially more than the amount of the forged check.

## BANK'S NO EVIDENCE MOTION IS IMPROPER

In paragraphs 7 and 8 of the Bank's Motion (CR 165), the Bank merely mentions the availability of a no evidence motion for summary judgment. However, nowhere does the Bank actually state that it is asserting a no evidence motion for summary judgment, which is unavailable in any event. First, the Bank has not specified any essential elements of a claim or defense for which there is no evidence and for which Calleja would have the burden to prove. Second, the Bank has the burden to prove the elements of its §§3.405, 3.406 and 4.406 defenses, which it failed to do. More significantly, Tex. Bus. & Comm. Code §§1.201(b)(20) and 1.304 require that the Bank pay the $38,700.00 forged check in "good faith," before the Bank can rely on the defenses in §4.406. *See, e.g.*, *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 563 (Tex. 1984). The term "good faith" requires

an objective observance of reasonable commercial standards of fair dealing. The Bank has produced no evidence of its procedures, and Calleja has produced evidence that the signature on the forged check did not even resemble his signature on the Bank's signature card. CR 71, 73, 230, 317-23. *See also McDowell v. Dallas Teachers Credit Union,* 772 S.W.2d 183, 188-91 (Tex. App. — Dallas 1989, *no writ*), which held that a bank's failure to compare signatures on checks with the signature card does not comply with reasonable commercial standards and is unfair.

## CALLEJA IS ENTITLED TO SUMMARY JUDGMENT

Calleja proved in its Motion for Summary Judgment that the Bank allowed unauthorized deductions from the Account, which caused a breach in the Account Agreement. CR 34-49. This is all that is required for Calleja to recover from the Bank. *See, e.g., FDIC v. Lenk*, 361 S.W.3d 602, 606-07 (Tex. 2012). The Bank's Response to Calleja's Motion assumed that unauthorized deductions were made from the Account (CR 161), but then devotes its entire Response attempting to show that it complied with its duties under Tex. Bus. & Comm. Code §4.406 by sending or making available to Calleja the relevant Account Statements, and that Calleja failed in a supposed duty under §4.406 to report the Bank's failure to properly send Account Statements. CR 166-71. The Bank's reliance on §4.406 is an affirmative defense, as to which the Bank has the burden of proof. *See, e.g,*

36

*FDIC v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012). As shown above, the Bank is not entitled to the benefits of §4.406 because the Bank failed to send or make available the relevant Account Statements as specified in both the 2008 and 2012 Account Agreements and as further provided by applicable case law.

## PRAYER

**WHEREFORE**, Appellant Francisco Calleja-Ahedo prays that this Court reverse the summary judgment granted by the trial court, render judgment in favor of Appellant on his Motion for Summary Judgment, or alternatively, remand this case to the trial court for determination of Appellant's attorney fees.

Respectfully submitted,

**O'CONNOR, CRAIG, GOULD & EVANS**

By: /s/ Michael C. O'Connor
  Michael C. O'Connor
  State Bar No. 15187000
  2500 Tanglewilde, Suite 222
  Houston, Texas 77063
  (713) 266-3311
  (713) 953-7513 (Fax)
  Email: moconnor@oconnorcraig.com

  **ATTORNEYS FOR APPELLANT**
  **FRANCISCO CALLEJA-AHEDO**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 9,577 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certificate and certificate of compliance). This is a computer generated document created using Microsoft Word, using 14-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on the following counsel of record by telephonic transfer or electronic service, on this the 10th day of August, 2015.

Michael D. Conner
Hirsch & Westheimer
1415 Louisiana, 36th Floor
Houston, Texas 77002
Facsimile: 713-223-9319
E-Mail: Mconner@hirschwest.com

/s/ Michael C. O'Connor
Michael C. O'Connor

No. 01-15-00210-CV

*IN THE*

*FIRST COURT OF APPEALS*

*HOUSTON, TEXAS*

---

FRANCISCO CALLEJA-AHEDO

Appellant

V.

COMPASS BANK

Appellee

---

On Appeal from the 55th District Court
Harris County, Texas

Trial Cause No. 2014-22168

---

**APPENDIX**

---

Appendix 1: Copy of Tex. Fin. Code §34.302

Appendix 2: Consumer Disclosure: 2008 Agreement

Appendix 3: *Compass Bank v. Nacim*, 459 S.W.3d 95 (Tex. App. - El Paso, 2015, *no pet.*)